Cathy Lynn HENDERSON, Appellant,

v.

STATE of Texas, Appellee.

No. 72,157.

Court of Criminal Appeals of Texas, En Banc.

Dec. 3, 1997.

Rehearing Denied March 4, 1998.

Keith S. Hampton, Austin, for appellant.

Philip A. Nelson, Jr., Assistant District Attorney, Matthew Paul, State's Atty., Austin, for the State.

## OPINION

KELLER, Judge delivered the opinion of the Court with respect to Parts 1, 2b, 3, and 4, in which McCORMICK, Presiding Judge, and MEYERS, MANSFIELD, PRICE, HOLLAND, and WOMACK, Judges joined, and an opinion with respect to Part 2a, in which MEYERS, PRICE and HOLLAND, Judges, joined, and in which MANSFIELD and WOMACK, Judges, joined only as to point of error nine.

In a trial beginning in May of 1995, appellant was convicted of the capital murder of three-and-a-half-month-old Brandon Baugh committed on January 21, 1994 in Travis County.[1] The jury answered the punishment issues in the State's favor, and appellant was sentenced to death. Direct appeal to this Court is automatic under Article 37.071(h).[2] Appellant raises seventeen points of error on appeal. We will affirm.

### 1. The maps

#### a. *Facts*

In points of error one through eight, and seventeen, appellant makes various complaints relating to the trial court's order compelling her attorneys to turn over maps of the victim's location. On the morning of January 21, 1994, Eryn and Melissa Baugh left their infant son, Brandon, with their babysitter, appellant. That day, both appellant and Brandon disappeared. A kidnapping investigation began the next day. Appellant was profiled on the television show "America's Most Wanted," and Texas law enforcement authorities and the FBI received tips indicating that appellant had been seen with the baby in Missouri and Idaho. In addition, law enforcement obtained information from appellant's daughter that the trunk of appellant's car had been slightly ajar during a trip on the 21st to Holland, Texas and that appellant had carried a diaper bag in her car.

On February 1, appellant was arrested by the FBI in Kansas City, Missouri. FBI

---

1. Texas Penal Code § 19.03(a)(8) provides that a person commits capital murder when "the person murders an individual under six years of age."

2. All references to articles refer to the Texas Code of Criminal Procedure unless otherwise indicated.

agent Michael Napier interrogated appellant, while FBI agent Timothy Hepperman observed from behind a one-way mirror. Appellant first denied any knowledge of Brandon's location or well-being. Later, she stated that the baby's grandmother, driving a car with Oklahoma license plates, picked up Brandon during the afternoon of January 21. Appellant later admitted to killing Brandon but claimed that his death was an accident. She told Agent Napier that she had buried the baby in a wooded area near Waco, that she had used a spade to dig the grave and had left the spade lying nearby, and that she could take an officer to the scene. Napier memorialized appellant's final story in writing, but she refused to sign the written statement. Agent Napier then turned to the subject of drawing a map, and asked appellant a number of times if she would draw a map of the baby's location. She repeatedly declined to do so and subsequently requested an attorney. The interrogation was then terminated. At the conclusion of the interview, Agents Napier and Hepperman both formed the subjective belief that the baby was dead. On February 2, 1994, Agent Hepperman communicated to Travis County deputies Stan Hibbs and Rick Wines that he believed the baby was dead and also that appellant had declined requests to draw a map.

That same day, Ronald Hall, assistant federal public defender in Kansas City, and Ronald Ninemire, chief investigator for the public defender's office, met with appellant. During the course of conversations with appellant, Hall determined that he needed a map. He contacted Agent Hepperman and inquired about obtaining a Texas map. Not knowing who Hall was, Hepperman was uncooperative. In response, Hall told Hepperman that he was trying to locate the baby. Frustrated in his attempts to obtain a map in the federal courthouse, Hall walked across the street to his office and obtained a Texas map from Ninemire's desk. Later, Hepperman arranged delivery of a Texas map to Hall and apologized for the earlier encounter.

After interviewing appellant, Hall talked to a group of law enforcement agents, including Carla Oppenheimer (the assistant U.S. Attorney handling the case), Agent Hepperman, and Deputies Hibbs and Wines. Hall told this group that he believed the baby was dead and buried in a wooded area outside Waco. Several of the law enforcement agents testified that Hall also stated that appellant had drawn a detailed map to the location of the baby and that he (Hall) had never been to Texas but could find the baby with the map. Hall denied making these statements regarding the map and denied that he ever volunteered that appellant had made a map. Instead, Hall testified that he was asked about a map and that he simply stated that all materials were being forwarded to appellant's attorneys in Texas. The testimony is uncontroverted, however, that Hibbs asked both Hall and Ninemire for copies of the map, and both declined such requests.[3] Hepperman and Oppenheimer nevertheless formed subjective beliefs that the map was made with an intent to be turned over to law enforcement. Hepperman based his belief on statements made by Hall to him in attempting to obtain a Texas map while Oppenheimer based her belief on statements made by appellant during the FBI interrogation.

That day, law enforcement authorities asked Nona Byington, appellant's Texas lawyer, for the map, and she attempted to negotiate a plea bargain in which she would exchange the maps in her possession for an agreed sentence. On February 3, a Travis County grand jury issued a subpoena duces tecum for Byington to appear and produce any maps in her possession that were created by appellant. Byington did not appear before the grand jury. Travis County Sheriff Terry Keel subsequently obtained an arrest warrant for Byington and a search warrant for her car and office. On February 4, the arrest warrant was withdrawn but the search warrant for Byington's office and car was executed. No maps were found in the search. During this period of time, Byington was herself represented by attorneys who claimed that the maps were covered by the

---

**3.** Hibbs admitted that he asked Hall if he could accidently leave a copy of the map on the fax machine.

attorney-client privilege. In addition, appellant herself signed an affidavit stating that all communications or materials conveyed by her to her attorneys during the course of representation were privileged and not to be disclosed.

Meanwhile, on February 2, appellant had been transferred from Missouri to Texas custody. While confined in Texas, appellant made various statements concerning Brandon's whereabouts. At one point, she denied any knowledge of the child's location and stated that he had gone with his grandmother. At another point, appellant stated that she could draw a map to a drop-off point in Missouri where the baby had been taken to Oklahoma.

On February 7, the grand jury issued another subpoena and the State filed a motion to compel production, in compliance with that subpoena, of any maps drawn by appellant in Byington's possession. A hearing was held before Judge Jon Wisser in which the State contended that (1) the maps were not confidential communications covered by the attorney-client privilege, and (2) the maps fell within the crime-fraud exception to the privilege. Judge Wisser granted the motion to compel. He found that, although an attorney-client relationship between Byington and appellant existed, the maps were not privileged because they were made with the intent to be turned over to law enforcement authorities. Judge Wisser explained that, in arriving at this conclusion, he consulted "one of my much more learned brethren of the law school," whom the parties later learned was Professor Guy Wellborn, an expert on the rules of evidence.

As a result of Judge Wisser's ruling, copies of two maps were turned over pursuant to the grand jury subpoena. According to Hibbs, the maps in fact indicated a grave site. Using the maps, law enforcement authorities found the baby's grave site and recovered his body.

Appellant subsequently filed a motion to recuse Judge Wisser from presiding over the remainder of the proceedings in the case.

This recusal motion alleged that Judge Wisser's previous consultation with Professor Wellborn violated the Code of Judicial Conduct and that Judge Wisser's further participation in the trial would compromise his ability to be impartial because he would be required to rule upon the propriety of that consultation. A different judge was assigned to hear the motion, testimony was heard, and the motion to recuse was overruled.

Appellant subsequently filed a motion to suppress "material revealed and recovered as a result of" the compelled release of the maps. After a hearing, Judge Wisser made numerous findings of fact and conclusions of law. A summary of his relevant conclusions are as follows: [4] (1) appellant was precluded from litigating the privilege issue at the motion to suppress because she failed to meet her burden at the motion to compel hearing when she had an opportunity to litigate the issue, (2) even considering the evidence at the motion to suppress hearing, the maps were not privileged because they were intended to aid law enforcement officers in locating the missing child and were not intended to be confidential, (3) the public defender did not violate the attorney-client privilege during the course of his discussions with law enforcement authorities, (4) the crime-fraud exception to the attorney-client privilege applied because there was evidence and information of an ongoing kidnapping at the time of the hearing on the motion to compel, (5) even if law enforcement authorities were bound by appellant's statements that the child was dead, the crime-fraud exception to the attorney-client privilege applied because appellant would be committing the ongoing crime of abuse of a corpse, (6) even if the maps were privileged communications not subject to exception, neither the "fruit of the poisonous tree doctrine" nor Article 38.23 required suppression of evidence recovered as a result of the production of the maps, and (7) appellant was not deprived of effective assistance of counsel.

---

**4.** For brevity and ease of reference, we have paraphrased some of the relevant conclusions and assigned our own numbering system.

### b. *Attorney-client privilege*

In point of error one, appellant contends that the trial court erred in granting the State's Motion to Compel. In point of error two, appellant contends that the trial court erred in refusing to grant her Motion to Suppress. And, in point of error three, appellant contends that the trial court erred in concluding that she was precluded from litigating the suppression issue by failing to meet her burden of proof at the motion to compel. We will assume, arguendo, that appellant was entitled to litigate her claims at the Motion to Suppress hearing. Therefore, we need not address the merits of point of error three, and we will address points one and two together. Further, for purposes of this opinion, we shall assume, without deciding, that the maps were intended to be confidential. We can therefore dispense with any discussion of the first two trial court conclusions in the above-outlined list. In the present discussion we shall focus primarily upon the crime-fraud exception and the exclusionary rule contained in Article 38.23.

■ The preliminary issue is the standard of review for resolving the applicability of the attorney-client privilege and any rule of exclusion that may result from the violation of such privilege. At least one federal circuit holds that "mixed questions of law and fact, regarding the applicability of the attorney-client privilege to particular communications" must be reviewed *de novo*. *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1413 (11th Cir.), *opinion modified on other grounds*, 30 F.3d 1347 (1994), *cert. denied*, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995). A majority of this Court has indicated that there are at least some circumstances in which a *de novo* review would apply to mixed questions of law and fact. *Villarreal v. State*, 935 S.W.2d 134, 138 n. 5 (Tex.Crim.App.1996)(plurality opinion); *Id.* at 139–141 (McCormick, J. concurring); *Id.* at 141–145 (Clinton, J. concurring); *Id.* at 145–150 (Keller, J. concurring). We need not, however, decide whether a *de novo* review should apply to privilege issues in general. Treating an application-of-law-to-fact question as a question of law subject to *de novo* review is appropriate when a court confronts important, clearly defined issues of first impression. *See Austin v. State*, 934 S.W.2d 672, 674–675 (Tex.Crim.App.1996). In the present case, the scope of the crime-fraud exception to the privilege and the operation of Article 38.23 in the attorney-client privilege context where a continuing offense is potentially at issue are important questions of first impression in this state. Hence, we will review *de novo* the application-of-law-to-fact issues relating to the crime-fraud exception and Article 38.23. Historical fact findings are, of course, still reviewed in the light most favorable to the trial court's ruling. *See Villarreal*, 935 S.W.2d at 146 & 150 (Keller, J. concurring).

We initially point out that the maps were never introduced into evidence and that the State made no reference during the trial to their existence. Hence, the maps themselves did not contribute to appellant's conviction or punishment; any reversible error with regard to obtaining the maps must necessarily turn upon other evidence obtained as a result of the information contained in the maps (i.e. "fruits" of the maps) that was introduced into evidence at trial. *See Baker v. State*, 956 S.W.2d 19, 21–22 (Tex.Crim.App.1997). The maps in the present case led to the victim's body. Whether any reversible error occurred, then, must necessarily turn upon whether Brandon's body was illegally obtained under Article 38.23 due to a violation of the attorney-client privilege. To answer that question, we must necessarily determine: (1) whether the privilege applies, and (2) if the privilege does apply, whether evidence obtained in violation of the privilege was obtained in violation of the law under Article 38.23.

■ For purposes of this opinion we have narrowed the applicability of the privilege question to whether the crime-fraud exception applies. *Boykin v. State*, 818 S.W.2d 782 (Tex.Crim.App.1991) requires appellate courts to construe a statute in accordance with the plain meaning of its literal text unless the language of the statute is ambiguous or the plain meaning leads to absurd results. *Id.* at 785. But, *Boykin*'s strictures do not apply to an appellate court's construction of the Rules of Criminal Evi-

dence. *Ludwig v. State*, 931 S.W.2d 239, 241 (Tex.Crim.App.1996). Appellate courts may consider extratextual sources to interpret a rule even if the plain language is unambiguous. *Id.* at 241 & 241 n. 6. And, in the past, we have construed a portion of the attorney-client privilege rule contrary to its literal text. *See Manning v. State*, 766 S.W.2d 551, 556–558 (Tex.App.—Dallas), *affirmed and opinion adopted*, 773 S.W.2d 568, 569 (Tex. Crim.App.1989)(phrase permitting client to prevent attorney from disclosing any fact arising from representation cannot be interpreted literally). Nevertheless, attorneys are guided by the rules—and the attorney-client privilege in particular—and we should attempt to effectuate the plain language absent important countervailing considerations. Hence, the plain language is a good place to begin. *Id.* at 241.

The crime-fraud exception to the attorney-client privilege provides as follows:

> (d) **Exceptions.** There is no privilege under this rule:
>
> (1) *Furtherance of Crime or Fraud.* If the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud.

Tex.R.Crim. Ev. 503(d)(1).[5] The plain language of the rule indicates that a continuing or future crime is not enough; the attorney's services must be sought or obtained *to enable or aid* commission of the crime. The title of the exception does not say merely "Crime or Fraud" but says instead *"Furtherance of* Crime or Fraud" (emphasis added).[6]

We have found no cases from this Court permitting a broader construction of this exception. The legislative history behind the rule states merely that "there is no privilege for communications made *in furtherance of* a crime or fraud which was an alternative holding of the Court of Criminal Appeals in

*Clark.*" Steven Goode, Hearing, Senate–House Select Committee on the Judiciary, Subcommittee on Criminal Matters, March 2, 1984, Tape 4, Side 7, transcript at 38 (emphasis added). The *Clark* case mentioned by Goode held that the crime-fraud exception included seeking and obtaining advice concerning the destruction of evidence. *Clark v. State*, 159 Tex.Crim. 187, 261 S.W.2d 339, 347, *cert. denied*, 346 U.S. 855, 74 S.Ct. 69, 98 L.Ed. 369 (1953)(attorney advised defendant to "get rid of the weapon"). *Clark* did not hold, however, that an attorney's mere knowledge of a continuing or future crime constituted services sought or obtained in furtherance of the crime.

■ One federal court has indicated that a communication is covered by the crime-fraud exception if it merely "reflect[s] an ongoing or future unlawful or illegal scheme or activity." *X Corp. v. Doe*, 805 F.Supp. 1298, 1307 (E.D.Va.1992), *affirmed*, 17 F.3d 1435 (4th Cir.1994). Whatever persuasive value this district court opinion has, such value is seriously undercut by the fact that the federal system has no formulated counterpart to the Texas attorney-client privilege rule; federal privilege doctrine is derived solely from common law. *See* Fed. R. Ev. 501. Moreover, the weight of authority addressing the issue appears to favor the contrary position. The D.C. and Second Circuits have held that the crime-fraud exception requires that the communications be in furtherance of criminal activity rather than merely "related" to it. *U.S. v. White*, 887 F.2d 267, 271 (D.C.Cir. 1989); *In Re Richard Roe, Inc.*, 68 F.3d 38, 40 (2nd Cir.1995).[7] Several other states addressing the issue have held that the client must seek the attorney's advice or assistance in furtherance of his criminal conduct for the crime-fraud exception to apply. *Purcell v. Dist. Atty. for Suffolk Dist.*, 424 Mass. 109, 676 N.E.2d 436, 440–441 (1997); *Kleinfeld v.*

---

**5.** All references to rules are to the Texas Rules of Criminal Evidence unless otherwise indicated.

**6.** The attorneys and the trial court explored this very question. During discussion, the trial court opined that the "enable or aid" language of the crime-fraud exception seemed contrary to the State's position.

**7.** *Roe* also holds that the crime must have been attempted or committed for the crime-fraud exception to apply. *Id.* at 40. That holding, however, is contrary to the language in Texas Rule 503(d)(1) that states that an attorney's services need only be "sought" to enable or aid a crime or fraud.

*State,* 568 So.2d 937, 939–940 (Fla.App. 4 Dist.1990); *In the Matter of Nackson,* 114 N.J. 527, 555 A.2d 1101, 1105–1106 (1989). *See also* Robert P. Mosteller, *Child Abuse Reporting Laws and Attorney Client Confidences: The Reality and the Specter of Lawyer as Informant,* 42 DUKE L.J. 203, 246 (1992). Based upon the above discussion, we cannot conclude that the crime-fraud exception can be satisfied by the mere pendency of ongoing criminal activity or the mere threat of future activity. The attorney's services must be sought or used to further the activity in question.

■ There is no evidence in the record in the present case to support the conclusion that the maps were made by appellant and given to her attorneys for the purpose of seeking their aid in committing a crime, under either the kidnapping or abuse of corpse theories. Merely revealing to her attorneys the location of the victim is not, by itself, an effort to seek their services to further a crime relating to that victim. Nor can her attorneys' refusal to divulge such information be reasonably considered to be activity in furtherance of a crime. Had appellant not drawn a map, law enforcement authorities would have been in the same position as if the attorneys had failed to release the maps that were drawn; so, appellant's creation of the maps and her attorney's refusal to release those maps did not further any crime. A different situation would exist if the attorneys had attempted to move the victim's body or had taken other affirmative steps to erase evidence of the victim's location or if the client had sought their help in doing so. But that is not the case before us. The crime-fraud exception does not apply; so we must now turn to the Article 38.23 question.

Article 38.23 provides in relevant part: "No evidence ... obtained in violation of any provisions of the ... laws of the State of Texas ... shall be admitted in evidence against the accused on the trial of any criminal case" (ellipses inserted). To determine the applicability of Article 38.23 we must answer two relevant questions:(1) can violations of the attorney-client privilege rule ever be considered violations of the law, and (2) if so, is a violation of the privilege *necessarily* a violation of the law? We find, under *Boykin,* that Article 38.23 is ambiguous with respect to these questions. The attorney-client privilege is not a statute, but a court-promulgated rule of evidence. We have found Article 38.23 to be inapplicable in several other non-statutory contexts, such as attorney disciplinary rule violations, *Henrich v. State,* 694 S.W.2d 341 (Tex.Crim.App.1985), and *Miranda* [8] violations, *Baker,* at 22–24.

We recognize, of course, that the attorney-client privilege differs in material respects from disciplinary rule and *Miranda* violations. Disciplinary rule violations are not, by themselves, grounds for reversal but are the domain of the State bar. *House v. State,* 947 S.W.2d 251, 253 (Tex.Crim.App.1997). By contrast, the attorney-client privilege is a rule of evidence that can, by itself, create reversible error. For example, *see Burnett v. State,* 642 S.W.2d 765 (Tex.Crim.App. 1983). As for the *Miranda* rule, it does not actually prohibit law enforcement officers from eliciting statements without the appropriate warnings; the rule merely prevents the admission of such statements into evidence. *Baker,* at 24. But, the attorney-client privilege actually confers upon the client the right to prevent disclosure of communications at any stage of the criminal proceedings. *See* Rule 503(b) and Rule 1101(b).

Moreover, the attorney-client privilege was codified by statute until this Court repealed the statute pursuant to its rule-making power and replaced it with the current rule of evidence. *See* Tex.Rev.Stat., Art. 1811f, § 9(a) & (b)(2); Former Article 38.10.[9] Even if we assumed, however, that the attorney-client privilege had the force of statute, that would not end the inquiry because a violation of procedures outlined in a statute

---

**8.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**9.** Former Article 38.10 provided in relevant part: ... except that an attorney at law shall not disclose a communication made to him by his client during the existence of that relationship, nor disclose any other fact which came to the knowledge of such attorney by reason of such relationship.

does not constitute a violation of the law unless the statutory proscriptions make such conduct illegal. For example, a violation of procedures outlined by Article 38.22 renders a confession inadmissible. *See* Article 38.22, §§ 2 & 3(a). But Article 38.22 does not provide that taking a confession in the absence of such procedures is in itself illegal.

Unlike the *Miranda* rule and Article 38.22, the literal text of Rule 503 purports to prohibit any disclosure of privileged communications at any time. But, whether a violation of that prohibition constitutes a law violation depends in large part upon the nature and significance of the attorney-client privilege, and to the extent that it does, we are not constrained by *Boykin* to interpret the rule in accordance with its literal language. Further, this Court construed former Article 38.10 in conformity with the common law, even though the literal text of the statute "was both overbroad and underinclusive of the common law privilege." Goode, Wellborn, and Sharlot, TEXAS PRACTICE, *Guide to the Texas Rules of Evidence: Civil and Criminal*, Vol. 1, § 503.1, p. 318.

Having determined that Article 38.23 is ambiguous with regard to whether it is applicable to the attorney-client privilege, we turn to extratextual factors to answer the two questions we have posed. While this Court has never addressed the applicability of Article 38.23 to Rule 503, we have considered its applicability to former Article 38.10. *Cruz v. State,* 586 S.W.2d 861, 865 (Tex.Crim.App. 1979). We held that statements by a client that were revealed in violation of the privilege were obtained in violation of the law under Article 38.23 and, hence, were inadmissible. *Id.* In that discussion we noted that the communications did not fall within any exceptions to the *ethical* rules found in the Code of Professional Responsibility. *Id.* The *Cruz* case, however, is of limited persuasiveness for several reasons: First, the old attorney-client privilege statute was worded very generally and contained no express exceptions. Hence, this Court implied exceptions and apparently looked to the ethical rules for

some guidance. By contrast, the current rule sets forth a number of exceptions—which is some indication that those exceptions are in fact exclusive. Second, we addressed the applicability of Article 38.23 only to the primary evidence, i.e. the revelation of privileged communications. *Cruz* did not address whether Article 38.23 applied to subsequently obtained evidence that does not itself fall within the confines of the privilege, i.e. physical evidence obtained as a result of the revelation of privileged communications.

Nevertheless, *Cruz* is some indication that disciplinary rules may have some impact upon the legality of evidence obtained as a result of the revelation of privileged information. That indication is further supported by the potential conflicts that may arise from isolationist interpretations of the current privilege and ethical rules. The ethical rules permit an attorney to reveal confidential information, privileged or not,[10] "[w]hen the lawyer has reason to believe it is necessary to do so in order to prevent the client from committing a criminal or fraudulent act." Tex. Disc. R. Prof. Conduct 1.05(c)(7). Further, the ethical rules *require* revelation "[w]hen a lawyer has confidential information clearly establishing that a client is likely to commit a criminal or fraudulent act that is likely to result in death or substantial bodily harm to a person." Tex. Disc. R. Prof. Conduct 1.05(e). The attorney must reveal such information "to the extent revelation reasonably appears necessary to prevent the client from committing the criminal or fraudulent act." *Id.* Unlike the crime-fraud exception, these ethical rules do not require an intent to use the attorney's services to *further* the criminal enterprise. *See also* Mosteller at 246–247. Hence, an attorney may be ethically permitted or even required to disclose privileged information. The drafters of these disciplinary rules expressly recognized that possibility:

Third, the lawyer may learn that a client intends prospective conduct that is criminal or fraudulent. The lawyer's knowledge of the client's purpose may enable the

---

10. "Confidential information" under the ethical rules includes both privileged and unprivileged information relating to the attorney's representation of the client. Tex. Disc. R. Prof. Conduct 1.05(a).

lawyer to prevent the commission of the prospective crime or fraud. When the threatened injury is grave, the lawyer's interest in preventing the harm may be more compelling than the interest in preserving confidentiality of information. As stated in sub-paragraph (c)(7), the lawyer has professional discretion, based upon reasonable appearances, to reveal both *privileged* and unprivileged information in order to prevent the client's commission of any criminal or fraudulent act. In some situations of this sort disclosure is *mandatory*. See paragraph (e) and Comments 18–20.

Tex. Disc. R. Prof. Conduct 1.05, comment 13 (emphasis added).

Because the crime-fraud exception is narrower than the relevant ethical rules, an absolutist interpretation of the attorney-client privilege would produce irreconcilable conflicts. Under some circumstances, the privilege would require the attorney to maintain confidentiality while the ethical rules would permit or even require disclosure. The potential for conflict can be minimized somewhat by interpreting some types of threatened future criminal activity as falling outside the definition of the privilege. Rule 503(b) states in relevant part that privileged communications are those that are "made for the purpose of facilitating the rendition of professional legal services." A client who informs his attorney that he or she intends to commit a future crime—but does not convey the information for the purpose of securing the attorney's services in furtherance of his plan—has arguably made a communication that is not for the purpose of facilitating the rendition of professional legal services. Hence, while such communications would fall outside the crime-fraud exception, they would also fall outside the definition of the privilege itself so that the privilege would present no bar to disclosure.

But this "collateral crime" theory does not necessarily work in the ongoing crime context. An ongoing crime combines aspects of past and future criminal activity. To the extent that it involves past activity, both the privilege and the ethical rules require maintaining confidentiality. But, to the extent

that an ongoing crime is continuing, the ethical rules logically permit and in some circumstances require disclosure to prevent the crime from continuing into the future. However, a client charged with an ongoing crime could convey information that is relevant both to representing the client as to the crime already committed and to preventing the crime from continuing into the future. As discussed previously with regard to the crime-fraud exception, the purpose of conveying such information need not be assisting the continuation of the crime.

This apparent dilemma can be illustrated with the following hypothetical: The client kidnaps a victim and places the victim, securely bound and gagged, in an old, abandoned warehouse. When the victim is discovered to be missing, the client is arrested for kidnapping. The client tells the attorney representing her on the kidnapping charge the location of the victim—a fact that only the client, and now her attorney, knows. That communication is not only an admission that the client did in fact kidnap the victim, but it also connects client to the crime by showing her *knowledge* of the victim's location. The communication is clearly relevant to the attorney's representation of the client for the kidnapping already committed and is therefore privileged so long as the client intended the information to be confidential. If the client does not seek the attorney's help in perpetuating the kidnapping but merely conveys the details of the continuing crime, then the crime-fraud exception is inapplicable, and in fact, no exception to the privilege applies. But, if the attorney fails to convey the information given by his client to the authorities, the victim will eventually die. So, disciplinary rule 1.05(e) requires that the attorney convey the information. The attorney in this hypothetical is caught in an apparent conflict between the attorney-client privilege and the ethical rule requiring disclosure.

■ The obvious resolution of this apparent conflict is that the privilege must yield to some extent. Of course, the ethical rules are not rules of evidence and do not themselves modify the attorney-client privilege. *See Kleinfeld*, 568 So.2d at 939. But, the ethical

rules embody strong policy interests that we believe can require the privilege to yield in a limited fashion to accommodate the policy interest in question. " 'None of this is to say that the privilege, while exceedingly important, is sacrosanct.' [Citation omitted]. There may be circumstances so grave ... that the privilege must yield to the most fundamental values of our justice system." *Nackson*, 555 A.2d at 1103 (bracketed material and ellipsis inserted). *See also Balla v. Gambro, Inc.*, 203 Ill.App.3d 57, 148 Ill.Dec. 446, 449, 560 N.E.2d 1043, 1046 (Ill.App. 1 Dist. 1 Div.1990)(balance of public policies favors disclosure to prevent serious bodily injury or death), *reversed on other grounds*, 145 Ill.2d 492, 164 Ill.Dec. 892, 897, 584 N.E.2d 104, 109 (1991)(recognizing duty of attorney to disclose).

However, the privilege need only yield in a limited fashion—to the extent necessary to satisfy the policy interest in question. *Purcell*, 676 N.E.2d at 441 (even if the crime-fraud exception does not apply, if attorney cannot dissuade client from intended criminal activity, he may elect to make a limited disclosure in the public interest). Even though the privilege has been forced to yield as a legal proscription to the superior policy interest, the privilege still exists and applies to all proceedings in which the policy interest is not implicated. As applied to the kidnapping hypothetical, this rule means that the attorney must disclose the victim's location to enable law enforcement authorities to terminate the kidnapping, but the client's communication to the attorney or the fact that the attorney conveyed the information to law enforcement personnel cannot be admitted into evidence at trial. *See Purcell*, 676 N.E.2d at 440. This interpretation gives effect to the privilege while taking into account strong policy interests in favor of disclosure. In many ways this reasoning is similar to cases in other states that require an attorney to release physical evidence in his possession to the authorities but prevent the government from disclosing to a trier of fact that the evidence came from the defendant's attorney. *See Hitch v. Pima County Superior Court*, 146 Ariz. 588, 708 P.2d 72, 79 (1985); *People v. Meredith*, 29 Cal.3d 682, 175 Cal. Rptr. 612, 620, 631 P.2d 46, 54 n. 8 (1981);

*State v. Olwell*, 64 Wash.2d 828, 394 P.2d 681, 685 (1964).

■ We think that the ethical rules accurately reflect the nature of the policy interests regarding an attorney's disclosure of ongoing or future criminal activity. The client cannot use Rule 503 to prevent an attorney's disclosure, in accordance with the disciplinary rules, of ongoing or future criminal activity. The next question, however, is whether an attorney may be *compelled* to disclose such information. Because the ethical rules do not themselves modify the attorney-client privilege, but merely reflect strong policy considerations to which the attorney-client privilege might yield, the assertion of strong policy interests is not limited to the situation in which the client's attorney is the party seeking disclosure. But, for a third party to intrude upon the attorney-client relationship, the policy justification must be strong enough that it imposes a duty upon the attorney to disclose. Hence, a third party can compel information only if needed to prevent or terminate a crime or fraud that is likely to result in death or serious bodily injury.

■ However, the standard of confidence that the criminal or fraudulent act will occur need not be that outlined in the disciplinary rule. Disciplinary rule 1.05(e) requires disclosure only when the attorney possesses information "clearly establishing" the likelihood of the criminal or fraudulent act that is likely to result in death or serious bodily injury. That language, however, is merely designed to protect attorneys from discipline in uncertain situations. *See* Tex. Disc. R. Prof. Conduct 1.05, comment 19. Obviously, third parties do not need this protection. The question then becomes what the proper standard of confidence should be. Given the importance of the interest involved, the standard should not be an onerous one. Law enforcement authorities should not be required to have a high degree of confidence that someone's life is at stake before they are permitted to take action designed to save a life. Even small risks of death or serious bodily injury are reasonable grounds upon which to act. Moreover, third parties are

less likely than a client's attorney to possess sufficient information to demonstrate such risks to a high degree of certainty. Given the above considerations, we hold that a third party need show only a reasonable possibility of the occurrence of a continuing or future crime likely to result in serious bodily injury or death to compel disclosure of the privileged information.[11]

■ Hence, determining that evidence is the fruit of a revealed privileged communication does not end the inquiry. Whether that evidence must be suppressed under Article 38.23 depends upon whether the privileged communication leading to that evidence was validly disclosed or compelled pursuant to strong public policy interests requiring the privilege to yield. If the privilege was legitimately required to yield then no law violation exists, and fruits of the privileged communication are not barred from evidence by Article 38.23.

■ Turning to the facts of the present case, we find that the attorney-client privilege was legitimately required to yield to the strong public policy interest of protecting a child from death or serious bodily injury. At the time the trial court compelled production of the maps, authorities had reason to believe that the baby might still be alive. Appellant had initially given conflicting stories to the FBI, and at least one of those stories indicated that Brandon was still alive. While appellant later claimed that the baby was dead, law enforcement officials were not bound to take her word for the matter. Further, she later told another inmate in Texas that the baby had been dropped off alive in Missouri to be taken to Oklahoma. Although the maps indicated a grave site and were consistent with appellant's claim that the baby was dead and buried near Waco, law enforcement officials were entitled to believe that appellant could be telling half-truths and

that the maps might lead to a live baby. Even if authorities believed that the chance of the maps leading to a live baby was remote, they were entitled to pursue that remote possibility.[12] If the child had been abandoned, or secreted with an accomplice of appellant's, his life or health might have been in jeopardy. Hence, authorities could obtain the maps in an attempt to terminate a kidnapping.[13] Points of error one through three are overruled.

### c. *Effective assistance of counsel*

In point of error four, appellant contends that she was deprived of the effective assistance of counsel when assistant public defender Ronald Hall revealed that appellant had drawn a map to the location of Brandon's body. Appellant also complains that Hall deprived her of effective assistance by telling authorities that he believed the child to be dead and buried in a wooded area near Waco. Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a showing of ineffective assistance of counsel has two components: (1) attorney errors and (2) prejudice. *Id.* at 687, 104 S.Ct. at 2064. Under the first prong, the defendant must show that the attorney's representation fell below an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. at 2064–65. Judicial scrutiny of attorney performance must be deferential and based upon the circumstances as they appeared at the time of representation. *Id.* at 689, 104 S.Ct. at 2065. To satisfy the second prong, the defendant must show a reasonable probability that, but for the attorney's errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068.

■ In arguing that Hall committed serious attorney errors under the first prong of *Strickland,* appellant advances two basic reasons for holding that the errors fall below an

---

11. Of course, the third party must otherwise have legal authority to compel such production.

12. Appellant argues that law enforcement authorities were not sincere when they contended before the trial court that they believed a possibility existed that the child was still alive. A determination of the sincerity of the witnesses is, however, the exclusive province of the trial court.

*Green v. State,* 934 S.W.2d 92, 98 (Tex.Crim.App. 1996).

13. We note that the "abuse of corpse" theory would *not* justify compelled release of the maps because that crime does not involve a likelihood of death or serious bodily injury to any person in the absence of compelled disclosure.

objective standard of reasonableness: (1) that Hall had no legitimate strategy for revealing the information, and (2) revealing the information violated the attorney-client privilege. The first claim has been procedurally defaulted because it was not made to the trial court; instead, appellant focused solely upon the alleged violation of the attorney-client privilege as rendering counsel's representation ineffective. The general rule is that a complaint must be timely lodged in the trial court to be preserved for appeal. Tex. R.App. P. 52(a). We generally make an exception for ineffective assistance of counsel claims because a defendant should not have "to risk alienating his trial lawyer" by making the ineffective assistance claim at trial. *Randle v. State,* 847 S.W.2d 576 (Tex.Crim. App.1993). But that reasoning does not hold true in the present case because Hall was no longer a part of the defense team when the motion to compel and the motion to suppress were litigated. In fact, in her motion to suppress and supporting brief, appellant claimed Hall to be ineffective for violating the attorney-client privilege.

■ Regarding her second reason for ineffectiveness, appellant assumes that Hall revealed privileged information. While there is support in the record for that conclusion, there is also support for the conclusion that Hall did not give that information. Hall denied revealing the existence of a map to the location of Brandon's body. The trial court's findings of fact support Hall's version of events. The trial court was entitled to believe Hall's testimony and disbelieve conflicting testimony. *Green,* 934 S.W.2d at 98.

Hall did admit that he asked an FBI agent for a map and said he was trying to locate the baby, and he admitted that he told law enforcement officials that he believed the baby to be dead and buried near Waco. But a mere request for a Texas map—even for the purpose of determining the baby's location—does not necessarily reflect any communication from the client, and even if we were to hold that it did, attempting to determine the contents of such a communication from Hall's request would be mere speculation. That Hall may have been attempting to determine the baby's location (perhaps because he was not yet sure whether the baby was alive or dead) does not mean that the client was inclined to reveal the location, nor does it mean that the client would *mark* that location on any map that was supplied. As for Hall's statement concerning the baby being buried near Waco, appellant had already given the FBI that precise information during Napier's interrogation session on February 1. Hence, that information, having been revealed to third parties, was not privileged. Point of error four is overruled.

#### d. *Due process / self-incrimination*

■ In point of error five, appellant contends that she was deprived of due process under the Fourteenth Amendment to the United States Constitution and due course of law under the Article I, § 19 of the Texas Constitution when Hall disclosed that she had made a map to the location of Brandon's body. She contends that these rights were violated because her attorney effectively lied to her by saying that the maps would be privileged and by then disclosing the maps' existence thereby enabling law enforcement authorities to secure them. But, as discussed with regard to point of error four, the evidence supports the conclusion that Hall never disclosed the existence of a map to Brandon's location. Moreover, while appellant generally contended that the attorney-client privilege was an important component of due process, she never made before the trial court the particular due process argument she makes in her brief before this Court. Hence, her due process argument has been procedurally defaulted. *See* Tex. R.App. P. 52(a).

In point of error six, appellant contends that her right against self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution was violated when Hall disclosed confidential information to government authorities. Appellant contends that her disclosures to her attorney were involuntarily induced by her belief that the information would be privileged, and she argues that her interview with Hall should be considered a custodial interrogation under

*Miranda.*[14]

As noted above, the record supports the conclusion that Hall did not disclose any confidential information given to him by appellant. But even if we assumed that such information was disclosed, appellant's claim would still fail.

The Supreme Court has held that compelled disclosure of information from a defendant's attorney does not implicate the defendant's Fifth Amendment right against self-incrimination, even if government compulsion of the same information from the defendant personally would have violated that right. *Fisher v. United States,* 425 U.S. 391, 397–400, 96 S.Ct. 1569, 1574–1576, 48 L.Ed.2d 39 (1976). Any protection against government encroachment in this area must come from other sources, such as the Fourth Amendment or the attorney-client privilege. *Id.* at 401, 96 S.Ct. at 1576.

■ We see no reason to treat differently voluntary disclosures by a defendant's attorney unless the attorney was acting as an agent of the government. *See Georgia v. McCollum,* 505 U.S. 42, 63–64, 112 S.Ct. 2348, 2361, 120 L.Ed.2d 33, 54 (1992). Appellant does not claim and advances no support for the proposition that Hall was an agent of the government. Hall was not an agent of the government merely because he was a public defender, *see McCollum,* 505 U.S. at 53–55 & 53 n. 9, 112 S.Ct. at 2356–2357 & 2356 n. 9, 120 L.Ed.2d at 49 & 49 n. 9, and we find nothing in the record that requires us to conclude that Hall was an agent of the government as a matter of fact. Point of error six is overruled.

■ In point of error seven, appellant contends that she was compelled to give evidence against herself in violation of Article I, § 10 of the Texas Constitution. She contends and argues that the right against self-incrimination under the Texas Constitution is broader than its federal counterpart. How-ever, this argument has been procedurally defaulted because she never advanced it to the trial court. *See* Tex.R.App. P. 52(a). Point of error seven is overruled.

### e. *Motion to recuse*

In point of error eight, appellant contends that the trial court erred in overruling her motion to recuse Judge Wisser. She complains that Judge Wisser violated the Code of Judicial Conduct and her due process and due course of law rights by consulting a disinterested expert *ex parte* without giving appellant an opportunity to respond. In her motion to recuse, appellant argued that Judge Wisser should be recused because he would be required to review the propriety of his own prior actions in a subsequent motion to suppress hearing and because a jury would be asked, at trial, to decide whether his actions were illegal.

■ We need not decide the propriety of Judge Wisser's actions under the Code of Judicial Conduct. Appellant has failed to preserve error for review. While Judge Wisser did not name the person he consulted at the time he delivered his order, he at least notified the parties that he had consulted someone from the law school. At that point in time, appellant should have objected, asked for the source and substance of the information, and requested an opportunity to respond or additional time to prepare a response. Appellant failed to do so. Hence, appellant had an opportunity to remedy the error of which she now complains.[15] Having failed to take that opportunity, she has procedurally defaulted her point of error. Tex. R.App. P. 52(a); *Hollins v. State,* 805 S.W.2d 475, 476–477 (Tex.Crim.App.1991). *See also Cockrell v. State,* 933 S.W.2d 73, 89 (Tex. Crim.App.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1442, 137 L.Ed.2d 548 (1997). Point of error eight is overruled.

---

14. Appellant also references some Texas constitutional provisions, but provides no argument under this point of error for interpreting those provisions more expansively than the federal constitution. Hence, we will address her arguments only as they relate to the federal constitution. *Johnson v. State,* 853 S.W.2d 527, 533 (Tex.Crim.App.1992), cert. denied, 510 U.S. 852, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993).

15. In fact, Judge Wisser indicated, during the motion to recuse hearing, that he would have given the parties an opportunity to respond if a request had been made.

#### f. *Hearsay*

In point of error seventeen, appellant contends that the trial court erred in overruling a running hearsay objection at the hearing on the State's Motion to Compel. The objection was directed towards testimony by Chief April Bacon concerning information received about Brandon's location. Appellant relies upon *McVickers v. State*, 874 S.W.2d 662 (Tex.Crim.App.1993), which held that a police officer cannot testify, at a suppression hearing, as to another police officer's reasons for conducting a traffic stop. *McVickers* held that the rules of evidence applied to suppression hearings because of the language contained in Rule 1101(d)(4) providing that the rules of evidence apply to "[m]otions to suppress confessions, or to suppress illegally obtained evidence under Texas Code of Criminal Procedure article 38.23." 874 S.W.2d at 665 (quoting Rule 1101(d)(4)).

However, the hearing at issue was not a motion to suppress; it was a motion to compel the production of evidence pursuant to a grand jury subpoena. *McVickers* does not apply because Rule 1101(d)(4) does not, by its terms, apply to motions to compel the production of evidence. Instead, the Motion to Compel proceeding is governed by Rule 104(a), which provides that the rules of evidence do not apply to a trial court's preliminary determination of the existence of a privilege. *See* Rule 104(a). Point of error seventeen is overruled.

### 2. Constitutionality of child capital murder provision

The constitutionality of Texas Penal Code § 19.03(a)(8), which defines as capital murder the intentional murder of an "individual under six years of age," is an issue of first impression in Texas. We note that one other state has had occasion to address a similar statute and has upheld its constitutionality. *Ex Parte Woodard*, 631 So.2d 1065 (Ala. Crim.App.1993), *cert. denied*, 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994). We now address appellant's challenges.

#### a. *Equal protection*

In points of error nine and ten, appellant contends that § 19.03(a)(8) violates the equal protection clauses in the federal and Texas constitutions. Appellant claims that there is no constitutionally permissible distinction between children under age six and children age six and over.

We must first determine the level of scrutiny required. A statute is evaluated under "strict scrutiny" if it interferes with a "fundamental right" or discriminates against a "suspect class." *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 458, 108 S.Ct. 2481, 2487–2488, 101 L.Ed.2d 399 (1988). Otherwise, a statute will ordinarily survive an equal protection challenge if "the challenged classification is rationally related to a legitimate governmental purpose." *Id.* ("rational basis" test).

Neither the United States Supreme Court nor this Court has ever expressly articulated the level of scrutiny that applies to an equal protection claim regarding the elements of a capital murder offense. The Fifth Circuit, relying upon *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), has held that the rational basis test applies. *Gray v. Lucas*, 677 F.2d 1086, 1104 (5th Cir.1982), *cert. denied*, 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983). Even though *Gregg* was a "cruel and unusual punishments" case, the Fifth Circuit relied on it in *Gray* to hold that equal protection could not require a higher level of scrutiny than the "clearly wrong" test announced in *Gregg*. *Gray*, 677 F.2d at 1104. The Fifth Circuit indicated that the presence of the death penalty did not implicate a fundamental right sufficient to invoke strict scrutiny. *Id.* In a later case, the Fifth Circuit, citing *Gray*, held that capital murder defendants did not constitute a "suspect class." *Williams v. Lynaugh*, 814 F.2d 205, 208 (5th Cir.1987), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 270 (1987).

It is beyond dispute that capital murder defendants do not constitute a "suspect class." *See Janecka v. State*, 739 S.W.2d 813, 834 (Tex.Crim.App.1987). The more difficult question, however, is whether the death penalty implicates a fundamental right sufficient to invoke strict scrutiny. We cannot agree with the Fifth Circuit's conclusion that the Supreme Court's Eighth Amendment juris-

prudence automatically forecloses the inquiry. The Equal Protection Clause serves purposes distinct from the prohibition against cruel and unusual punishments. Hence, we conduct a closer examination of the issue.

In an analogous situation, the United States Supreme Court has held that a fundamental right exists sufficient to invoke strict scrutiny for equal protection purposes. *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). *Skinner* examined an Oklahoma law that required sterilization of a person convicted three times of crimes "amounting to felonies of moral turpitude." *Id.* at 536, 62 S.Ct. at 1111. Some offenses—including embezzlement—were expressly excepted from the statute's application. *Id.* at 537, 62 S.Ct. at 1111. The Supreme Court held that the statute violated the Equal Protection Clause by applying to larcenists but not to embezzlers. *Id.* at 542, 62 S.Ct. at 1113–1114. In arriving at its holding, the Court emphasized the fundamental nature of the right at stake:

> We are dealing here with legislation which involves *one of the basic civil rights of man.* Marriage and procreation are fundamental to the very existence and survival of the race. The power to sterilize, if exercised, may have subtle, far-reaching and devastating effects. In evil or reckless hands it can cause races or types which are inimical to the dominant group to wither and disappear. *There is no redemption for the individual whom the law touches.* Any experiment which the State conducts is to *his irreparable injury.* He is *forever* deprived of a basic liberty. We mention these matters not to reexamine the scope of the police power of the States. We advert to them merely in emphasis of our view that *strict scrutiny* of the classification a State makes in a sterilization law is essential, lest unwittingly, or otherwise, invidious discriminations are made against groups or types of individuals in violation of the constitutional guaranty of just and equal laws.

*Id.* at 541, 62 S.Ct. at 1113 (emphasis added). We would find it strange, indeed, to hold that the right to life is any less fundamental than the right to procreation. As sterilization was in *Skinner,* death is irrevocable. Life is surely the most basic right of all.

 Nevertheless, privileges that are ordinarily viewed as "fundamental rights" may lose that character under some circumstances. Freedom from confinement has been recognized as a fundamental right that triggers heightened scrutiny before conviction of a crime but not afterwards. *Chapman v. United States,* 500 U.S. 453, 464–465, 111 S.Ct. 1919, 1927–1928, 114 L.Ed.2d 524 (1991). *See also Foucha v. Louisiana,* 504 U.S. 71, 80, 112 S.Ct. 1780, 1785–1786, 118 L.Ed.2d 437 (1992)(majority opinion); *Id.* at 85–86, 112 S.Ct. at 1788–1789 (plurality portion of opinion)(equal protection requires a particularly convincing reason for discrimination involving deprivation of liberty for someone acquitted by reason of insanity); *Id.* at 90 & 93, 112 S.Ct. at 1790–1793 (Kennedy, J. dissenting)(heightened scrutiny applies to deprivations of liberty before adjudication based upon the "beyond reasonable doubt" standard but not afterwards). However, a conviction does not automatically cut off all fundamental rights. As shown by *Skinner,* convicted criminals nevertheless retain rights involving procreation. It follows that mere conviction of a crime does not extinguish the convicted person's fundamental right to life. But, conviction for a crime of a certain type and severity is another matter entirely. When a person intentionally or knowingly kills another, *see* Tex. Pen.Code §§ 19.02 & 19.03, or anticipates that a human life would be taken during criminal activity with co-conspirators and a human life is taken, *see* Article 37.071 § 2(b)(2), then that person forfeits any expectation that his or her own life will be held sacrosanct. Such a person has inflicted upon his or her victim the same consequence—death—that the government subsequently seeks to inflict upon him or her. Hence, life no longer occupies the status of a *fundamental right for persons who have been convicted under the current capital murder scheme.* Therefore, consistent with *Chapman,* we will review appellant's claim under the rational basis test.[16]

---

**16.** Appellant argues that Article I, § 3 of the Texas Constitution requires strict scrutiny be-

The Supreme Court has consistently recognized that a state has a legitimate, and in fact compelling, interest in protecting the well-being of its children. *Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727, ——, 116 S.Ct. 2374, 2379, 135 L.Ed.2d 888 (1996)(compelling interest in protecting children from indecent speech); *Maryland v. Craig*, 497 U.S. 836, 853, 110 S.Ct. 3157, 3167, 111 L.Ed.2d 666 (protecting child's psychological well-being sufficiently important in some cases to outweigh a defendant's right to face-to-face confrontation); *Osborne v. Ohio*, 495 U.S. 103, 110, 110 S.Ct. 1691, 1696–1697, 109 L.Ed.2d 98 (state's interest in protecting victims of child pornography). The Court has sustained laws aimed at protecting children even when those laws " 'have operated in the sensitive area of constitutionally protected rights.' " *Craig*, 497 U.S. at 852, 110 S.Ct. at 3167 (quoting *New York v. Ferber*, 458 U.S. 747, 757, 102 S.Ct. 3348, 3354–3355, 73 L.Ed.2d 1113 (1982)). We think that the concerns behind protecting children also support demarking a sub-class of "young children" within the category of "children" as a whole. Children are deemed to warrant protection because of their inexperience, lack of social and intellectual development, moral innocence, and vulnerability. These characteristics apply with the greatest force to the youngest children. Moreover, the fact that crimes directed toward young children are necessarily targeted at the most innocent and vulnerable members of society makes such crimes among the most morally outrageous. "[E]xpression of society's moral outrage at particularly offensive conduct ... is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs." *Gregg*, 428 U.S. at 183, 96 S.Ct. at 2929–2930 (opinion of Stewart, Powell, and Stevens, JJ.)(ellipsis inserted).

The next question is whether § 19.03(a)(8) is rationally related to serve the government's interests in protecting young children and expressing society's moral outrage against the murder of young children. Appellant argues that drawing the line between five-year-olds and six-year-olds is arbitrary. But, for a child-murderer provision to retain clarity, a numerical line must be drawn somewhere. The age of a child is a natural, biological difference, and determining exactly where to draw the line of demarcation—how young is young enough—is an inherently difficult task. Moreover, the age of a child is directly relevant to the qualities of innocence and vulnerability. Those qualities, in turn, largely form the basis of the moral outrage generated by the murder of the very young.

■ Hence, the Legislature is justified in drawing a line between younger and older children, and age six seems to us to be as good a place as any to draw such a line. In the legislative history, attached by appellant as an appendix, Senator Brown states that children under six are generally still within the home and are therefore uniquely vulnerable to caregivers because other adults, such as teachers, may not be around to safeguard the children's welfare. SB 13, Public Hearing, Senate Criminal Jurisprudence Committee, March 3, 1993. Of course, five-year olds may be in kindergarten, and younger children may be in day care. But, we need not and do not resort to such environment-specific justifications to uphold the Legislature's line-drawing choice. Children under six are, by any stretch of the imagination, young children who deserve special protection and whose murders would be viewed by society as especially heinous. That the line might have been legitimately drawn at three, four, or five, or at seven, eight, or perhaps higher does not invalidate the Legislature's choice here. To find otherwise, we would either have to hold that the Legislature cannot draw an age line—which would effectively

cause of the fundamental interest at stake—"the right not to be subjected to the death penalty." As discussed above, we hold that "life" no longer occupies the status of a fundamental right for federal equal protection purposes after a conviction for capital murder. Other than to note the importance of life, appellant offers no reason for construing the Texas Constitution as conferring

greater protection in this area of the law than the federal constitution, and she cites no authority. Under these circumstances, we decline to address her state constitutional argument. *See Johnson v. State*, 853 S.W.2d 527, 533 (Tex.Crim. App.1992), cert. denied, 510 U.S. 852, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993).

eviscerate any attempt to include child-murders within the ambit of the capital murder statute—or we would have to hold that the line should be drawn elsewhere—in which case, we would merely be legislating from the bench. We decline to pursue either of those options, and we uphold the Legislature's decision to draw the line at age six. Points of error nine and ten are overruled.

### b. *Cruel/unusual punishment*

In points of error eleven and twelve, appellant contends that § 19.03(a)(8) violates the cruel and/or unusual punishment provisions found in the Eighth Amendment to the United States Constitution and Article I, § 13 of the Texas Constitution. Appellant's arguments under the Eighth Amendment largely duplicate his arguments under equal protection but we will, nevertheless, address separately the basic Eighth Amendment issue.

To pass muster under the Eighth Amendment, an aggravating circumstance contained in an element of a capital offense must meet two requirements: "First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. [Citation omitted]. Second, the aggravating circumstance must not be unconstitutionally vague." *Tuilaepa v. California*, 512 U.S. 967, 971–972, 114 S.Ct. 2630, 2634–2635, 129 L.Ed.2d 750, 759 (1994). The child-murder provision meets both tests: murderers of children under six is a subclass of murderers in general, and "children under six" is a clear and definite category.[17] Points of error eleven and twelve are overruled.

### 3. Confession

In points of error thirteen through fifteen, appellant contends that her confession to Agent Napier was obtained involuntarily in violation of Articles 38.21 and 38.22 of the Texas Code of Criminal Procedure, the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, §§ 10 and 19 of the Texas Constitution.[18] She argues that her confession was involuntary because (1) Napier induced her to incriminate herself through sympathy with a "Christian burial" speech, and (2) that he led her to believe that she would be able to stay in Missouri if she confessed.

### a. *Facts*

Early in the interview, Agent Napier told appellant that she was at a crossroads, that she could determine which path to take, and that she could tell her story or let the justice system take its course. Later in the interview, appellant offered to tell everything she knew in exchange for staying in Missouri. In response, Napier asked questions such as: "What do you mean?" "What's everything?" Napier never promised appellant that she could stay in Missouri, and in fact, told her that he was not in a position to make any bargains, deals, or promises. He also told her that the people in a position to make a

---

17. Appellant argues that Article I, § 13 of the Texas Constitution is broader than the Eighth Amendment in that it requires strict scrutiny of death penalty classifications. In support, she points out that the Texas Constitution prohibits punishments that are "cruel *or* unusual" while the federal constitution prohibits punishments that are "cruel *and* unusual." But she never explains why this difference in wording requires employment of the strict scrutiny test. She contends that we should import equal protection jurisprudence regarding suspect classifications to "temper the continuous legislative pressure to make all headline-worthy and politically-exploitable crimes capital offenses" and to create "an objective and necessary check against the demagoguery and irrationality which plague death penalty legislation." She fails to explain, however, why suspect classification jurisprudence is needed for those purposes, why federal constitutional protections fail to adequately address such purposes, or why the Texas "cruel or unusual" punishments clause implicates those purposes beyond protections given by the federal constitution. Further, having already rejected strict scrutiny in the equal protection context, we see no reason to support importing equal protection concepts through some other constitutional provision. Appellant has failed to articulate a reason for separately addressing his state constitutional claim, and we decline to do so. *See Johnson*, 853 S.W.2d at 533.

18. Because Napier's interrogation occurred outside Texas, there is a question as to whether Article 38.21 & 38.22 and the provisions of the Texas Constitution even apply. We do not decide that issue but assume for the sake of argument that those provisions are applicable to the present case.

deal would want to have a basis for making their decision. Later, through leading questions, Napier elicited from appellant a confession that she killed the baby. He asked appellant, "When you say the whole thing, are you talking about that Brandon is dead, that you know where the body's located, that it was an accident, that you're sorry?" Appellant responded by nodding her head. Later Napier stated, "Brandon's dead. It was an accident." To this statement, appellant replied, "Yes." Napier asked, "Did you bury him." Appellant responded, "Of course, I did. He's just a baby." Subsequent interrogation led to appellant's statement that she had buried Brandon in a wooded area near Waco. At that point, Napier asked appellant to draw a map so that the authorities could find Brandon. Napier talked about Brandon's parents and talked about their need to "put closure" on this episode. Appellant, however, refused to draw a map.

### b. Standard of review

Appellant urges that we adopt the federal system's standard of review for mixed questions of law and fact and cites *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). In the federal system, the standard of review concerning the voluntariness of confessions is a deferential review of the trial court's determination of the historical facts and a *de novo* review of the law's application to those facts. *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). This is the same standard articulated in *Ornelas*. *See Ornelas*, generally; *Villarreal*, 935 S.W.2d at 139–141 (McCormick, J. concurring) and 145–150 (Keller, J.concurring). We need not decide whether to adopt the *Ornelas/Miller* standard here because appellant loses under any standard of review arguably applicable to this case. As the *Ornelas/Miller* standard is the most favorable to appellant in the present case, we will assume without deciding that it is the applicable standard and review the case accordingly.

### a. The merits

We may easily dispense with appellant's attack on Napier's statements regarding "closure" for Brandon's parents. Those statements were made after appellant had revealed that Brandon was buried near Waco. Those statements were attempts by Napier to persuade appellant to draw a map. But she refused to draw a map; so, appellant gave no statements that are a product of Napier's attempt to play upon her sympathies. Without any product statements, appellant has no involuntary confession claim under any authority.

That leaves appellant's claim that Napier influenced her to give a confession with the hope of remaining in Missouri. Appellant first contends that Napier's conduct constituted an improper inducement under Article 38.21.[19] In essence, appellant contends that the Missouri conversation acted as an improper promise that caused her to confess. For a promise to render a confession invalid under Article 38.21, it must be (1) positive, (2) made or sanctioned by someone in authority, and (3) of such an influential nature that it would cause a defendant to speak untruthfully. *Janecka v. State*, 937 S.W.2d 456, 466 (Tex.Crim.App.1996); *Muniz v. State*, 851 S.W.2d 238, 254 (Tex.Crim. App.), *cert. denied*, 510 U.S. 837, 114 S.Ct. 116, 126 L.Ed.2d 82 (1993).

However, appellant's claim cannot even get off the ground because no promise ever existed. Napier never promised appellant that she could stay in Missouri if she confessed. Moreover, appellant initiated the idea of a "deal" for staying in Missouri. Having cast herself in the role of entrepreneur, she cannot expect an appellate court to find implied "promises" in official responses (to her overtures) that are ambiguous at best. *See Jacobs v. State*, 787 S.W.2d 397, 400 (Tex.Crim.App.1990). And, even if we were to imply some sort of promise from the conversation, it was not made or sanctioned by someone in authority. Appellant contends that such a rule opens the door to

**19.** Article 38.21 provides that: "A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed."

wide-ranging police misconduct by permitting the police to obtain confessions by making promises they cannot deliver. Whatever the merits of appellant's argument as a general proposition, it would apply only where a police officer appears to, but does not in fact possess, the requisite authority. In the present case, however, Napier clearly informed appellant that he did not have the authority to make any deals. Because appellant knew Napier had no authority, she could not have been improperly induced by any alleged promises.

As for her claim that Napier violated Article 38.22, appellant points to no section of 38.22 that she believes was violated. She merely cites *Dunn v. State*, 721 S.W.2d 325 (Tex.Crim.App.1986) for the proposition that Article 38.22 is violated if a law enforcement agent tells the accused that his statement may be used "for or against him." Appellant does not contend, however, that Napier used the offending language. She merely argues that what Napier said is "more specific" than the language condemned in *Dunn*. But, appellant does not explain why being "more specific" brings Napier's questioning within the prohibitions of Article 38.22. *Dunn*'s holding was based upon the peculiarities of the particular phrase "for or against" and has no application to the case at bar. *See* 721 S.W.2d at 341.

■ With regard to her federal constitutional arguments, appellant cites the federal due process standard for voluntary confessions: "Is the confession the product of an essentially free and unconstrained choice by its maker?" *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). She contends that the state bears the burden of proving the voluntariness of a confession but does not explain why she believes the state has failed to meet this burden. Our review of the record indicates to us that appellant's confession was indeed the product of an essentially free and unconstrained choice upon appellant's part. Nothing in the record suggests that Napier used

any coercive tactics to obtain information. As discussed above, Napier made no promises to appellant, and he told her that he had no authority to make deals. Moreover, as discussed above, the record shows that appellant initiated the "Missouri deal" idea and Napier made, at most, noncommittal replies.

■ Appellant next advances two claims under the Texas Constitution. First, she argues that the Texas Constitution places upon the State the burden of proving the voluntariness of a confession beyond a reasonable doubt as opposed to a mere preponderance of the evidence under the federal constitution. We need not decide whether the Texas Constitution provides broader protection in this respect. Appellant has not explained why she should prevail under her proposed standard. Even if we reviewed the admissibility of the confession under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard [20] for legal sufficiency of the evidence, which incorporates the reasonable doubt standard, the evidence is sufficient to show that appellant's confession was voluntary.

In her second state constitutional claim, appellant contends that *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897) is the law in Texas. *Bram* contains some language that indicates that any promise, no matter how small its influence, renders a confession involuntary. *Id.* at 542–543, 18 S.Ct. at 186–187. Appellant contends that we should interpret the Texas Constitution to embody the *Bram* standard instead of the *Schneckloth* standard because *Bram* was the Supreme Court precedent in effect at the time the Fifth Amendment's right against compelled self-incrimination was applied to the states and because this Court has never articulated a standard of admissibility that exceeds the minimum federal requirements.

■ But appellant's argument contains a number of faulty premises. First, the Supreme Court maintained in *Schneckloth* that the standard it articulated has always been the applicable standard: "The ultimate test

---

**20.** The *Jackson* standard is: "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found [the issue in question] beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. at 2789 (emphasis in original, bracketed material substituted for original).

remains that which has been the only clearly established test in Anglo–American courts for two hundred years." 412 U.S. at 225, 93 S.Ct. at 2047. Second, even if *Bram* represented a different standard, the fact that it may have been in existence at the time federal constitutional requirements were applied to the states does not mean that we automatically adopted that standard as a matter of *state* constitutional law. Appellant concedes elsewhere, as she must to even advance a separate state constitutional claim, that Texas is not bound to interpret its constitution in lockstep with the federal constitution. *See Heitman v. State*, 815 S.W.2d 681 (Tex.Crim. App.1991). *Bram*'s interpretation of federal constitutional law does not govern or bind our interpretation of the Texas Constitution. The only way outdated federal precedent could have any logical impact on state constitutional interpretation would be for this Court to accept two unstated premises: (1) that the state constitution cannot provide less protection than the federal constitutional minimum, and (2) that a federal constitutional minimum standard, once articulated, becomes the standard for the state constitution, even if the United States Supreme Court later retracts its position. Appellant has given us no reason to believe that either of those unstated assumptions is correct. Finally, even if *Bram* were the standard, that case still requires the existence of a "promise" as a condition that vitiates voluntariness, and no promise was made in the present case. Points of error thirteen, fourteen, and fifteen are overruled.

### 4. "Extraneous" offense

In point of error sixteen, appellant contends that the trial court erred in admitting testimony from a witness concerning an admission made by appellant that she committed a murder. We set out the relevant portion of the complained-of testimony:

A. I asked her if she had been in any trouble.

Q. Yes. What did she say?

A. I asked her why she was moving to—"There's trouble, right"? And that's

when she said that she had killed somebody or murdered somebody.

Q. I want you to tell me what she said. Is that what she told you?

A. Yes.

Q. That she'd killed or murdered someone?

A. I'm not sure of her exact words?

Q. Okay. One of those words?

A. Yes.

Q. What did you say?

A. I just said, "Why?" You know, I mean, why—I didn't believe it, and I said, "Why?"

Q. What did she say?

A. She said,"Because they kept f—ing with me."

Q. Did you ever remember asking about the gender of this person.

A. Yes.

Q. What was you question?

A. I said, "Male or female?" And she said, "Male."

Q. What were you doing when you were having this conversation with her?

A. Crushing ice for the margaritas.

Q. And what were you crushing the ice with?

A. Knife.

Q. Did she ever make a statement about that?

A. Yeah, she said that—she said that's what she used.

Q. What do you mean by that?

A. I had a knife in my hand and she said, "That's what I used."

Q. Did she make any other statements about this person?

A. No. Just the fact that she mumbled like—I'm not sure I heard it all—their arm may be out or something.

(Expletive ellipsed).

Appellant contends that this testimony constitutes evidence of an extraneous offense (i.e. murder of someone other than Brandon) and is therefore irrelevant under Rule 401.[21]

---

**21.** Rule 401 provides:

"Relevant evidence" means evidence having any

The State contends that the testimony is a reference to the *present* offense, and therefore, is an admission by appellant that she killed Brandon intentionally.[22] Appellant claims, however, that there is no evidence in the record to suggest that the testimony refers to the offense at trial. Alternatively, appellant contends that the testimony is unfairly prejudicial under Rule 403 [23] because the jury "had every reason to believe, in light of all the dissimilarities, that appellant had actually killed someone else." Hence, appellant argues, even if the evidence did not technically violate the prohibitions against extraneous offense evidence found in Rule 404(b),[24] the evidence was unfairly prejudicial under Rule 403 because it effectively appeared in such a posture to the jury. Appellant further contends that the testimony concerning an arm hanging out of a freshly buried body contributes to the unfairly prejudicial impact of the evidence.

■■■ We disagree with appellant's contention that the testimony must necessarily be viewed as evidence of an extraneous offense. The testimony could rationally be viewed by a jury as an admission to committing the offense at trial. Appellant admitted to killing a "male," and the victim in the present case was a male. Appellant was moving because she was "in trouble," and she was in trouble because she had killed someone. A jury could believe appellant's "trouble" stemmed from highly publicized law enforcement efforts to locate the missing baby that she killed rather than from another murder that was never reported. While appellant's description of the crime to the witness is at variance with the evidence at trial concerning how Brandon was in fact murdered, that appellant would choose to give incorrect details is easily understandable. Appellant was

relating her reasons for hiding from the authorities to an apparent friend or acquaintance. Appellant would be unlikely to receive any sympathy for killing a baby. In fact, such a revelation might have incited her friend to report appellant to the authorities. Moreover, aside from the disputed testimony, the State never attempted to show that appellant committed an extraneous murder. And the State never characterized the testimony in question as an extraneous murder. On the contrary, during closing argument the State explicitly argued that appellant's statement to the witness was an admission that she killed Brandon.

Hence, the witness' testimony was highly probative of appellant's guilt and is therefore relevant under Rule 401. Further, the testimony would not be prohibited by Rule 404(b) because it was offered not to show an extraneous offense but as an admission concerning the primary offense.

■■■ Finally, Rule 403 does not warrant exclusion. Although the present case is not a traditional extraneous offense case, since the evidence is only arguably an extraneous offense, some of the factors relevant to determining the probative value of an extraneous offense versus its prejudicial effect are nevertheless relevant considerations. These include:(1) the State's need for the evidence, (2) how probative the evidence is to a contested issue, and (3) whether a limiting instruction would have been effective in preventing the jury from being influenced by the evidence's prejudicial aspects. *See Montgomery v. State*, 810 S.W.2d 372, 392–393 (Tex.Crim.App.1990). We believe it appropriate to add to the present situation, involving a challenge to evidence that may or may not be an extraneous offense, an additional

---

tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

**22.** We note that this contention is not an "eleventh hour" argument. When the admissibility of the evidence was contested, the State maintained before the trial judge that the testimony referred to the offense at trial.

**23.** Rule 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by

the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

**24.** Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith" but may be admissible for other purposes, some of which are outlined in the text of the rule.

factor: the relative risk that the evidence will be perceived as referring to an extraneous offense. Here, these factors all weigh in favor of the State. The only contested issue in the case was whether the killing was intentional. Appellant's confession contended that the death was an accident, and the other evidence of intent consisted of the circumstantial evidence provided by the autopsy of the baby's body. An admission of intent by the appellant, therefore, would be an important (although not essential) part of the State's case. And, as explained above, the evidence was highly probative of appellant's guilt. Moreover, the risk that the jury would view the testimony as evidence of an extraneous offense was small, given the circumstances of appellant's flight from Texas. And, the State minimized any risk that a jury would draw an improper inference of extraneous misconduct in its closing argument by arguing that the evidence was an admission of guilt of the offense on trial. In addition, a limiting instruction that the testimony could not be considered as an additional offense but only as evidence of the offense on trial could have further reduced any risk that the jury would perceive that an extraneous offense had been presented.[25]

As for appellant's concern about the witness' reference to the arm, we find that the reference was relatively vague in the witness' testimony before the jury.[26] We perceive no significant contribution from that reference to the prejudicial effect of the testimony as a whole. Point of error sixteen is overruled.

The judgment of the trial court is affirmed.

BAIRD and OVERSTREET, JJ., not participating.

McCORMICK, Presiding Judge, concurring.

In points of error nine and ten, appellant claims Tex.Pen.Cd., Section 19.03(a)(8), violates equal protection principles. I agree with the majority that these points should be overruled but for different reasons than those advanced by the majority.

I would dispose of these points of error by holding that no state or federal equal protection questions are presented because "similarly situated" individuals (i.e, all those who intentionally or knowingly murder a child under the age of six) are treated the same. See *Vacco v. Quill*, 521 U.S. ——, —— – ——, 117 S.Ct. 2293, 2297–2298, 138 L.Ed.2d 834, 841 (1997) (Fourteenth Amendment's Equal Protection Clause creates no substantive rights; instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly); *Ex parte Davis*, 947 S.W.2d 216, 228 (Tex.Cr. App.1996) (McCormick, P.J., concurring, joined by White, J., Meyers, J., Keller, J., and Mansfield, J.) (when all similarly situated capital murder defendants are treated the same, there simply is no colorable equal protection claim), citing *Dinkins v. State*, 894 S.W.2d 330, 363 (Tex.Cr.App.1995) (Clinton, J., dissenting). Because Section 19.03(a)(8) makes no "classifications" or "distinctions" between "similarly situated" individuals, then it is unnecessary to take the equal protection analysis to the next step of determining whether a "fundamental right" or a "suspect" class is involved. See *Vacco*, 521 U.S. at —— – ——, 117 S.Ct. at 2297–2298, 138 L.Ed.2d at 841 (if a legislative *classification* or *distinction* " 'neither burdens a fundamental right nor targets a suspect class,' " the federal judiciary will uphold it " 'so long as it bears a rational relation to some legitimate end' ").

Somewhat intertwined with appellant's equal protection claim is a due process claim. Section 19.03(a)(8) does not violate Due Process principles because individuals possess no "liberty interest" to murder children under the age of six. See *Washington v. Glucksberg*, 521 U.S. ——, —— – ——, 117 S.Ct. 2258, 2267–2268, 138 L.Ed.2d 772, 787 (1997) (Courts should exercise restraint in expand-

---

**25.** No limiting instruction was requested or given.

**26.** The witness' testimony was clearer during testimony *outside* the jury's presence, where the witness related that appellant had been unsure whether she had completely buried the body or had left an arm hanging out. The reference to burial was omitted in the testimony during the jury's presence, and the witness merely testified that appellant had mumbled something about an arm being out.

ing the concept of substantive due process "lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of this Court").

Based on the foregoing, I do not believe the judiciary has any power to subject Section 19.03(a)(8) to any level of judicial "scrutiny" on equal protection or due process grounds. See *Vacco,* 521 U.S. at —— – ——, 117 S.Ct. at 2297–2298, 138 L.Ed.2d at 841; *Glucksberg,* 521 U.S. at —— – ——, 117 S.Ct. at 2267–2268, 138 L.Ed.2d at 787. Texas citizens without any interference from the judiciary have the power to make all those who kill children under the age of six subject to the death penalty.

With these comments, I concur only in the result the majority reaches in disposing of appellant's points of error nine and ten. I otherwise join the Court's opinion.

WOMACK, Judge, concurring.

Point of Error Ten is, "Section 19.03(a)(8) of the Texas Penal Code is unconstitutional on its face because it violates the Sixth [*sic* ] and Fourteenth Amendments to the United States Constitution." I join the Court's judgment in overruling this point, but my reasons differ from those of the Presiding Judge and Judge Keller.

Remarkably, the appellant never uses the words "equal protection" in her brief on this point, and the reason for invoking the Sixth Amendment is not clear. But after examining the cases she cites, I agree that her argument is based on the Equal Protection Clause of the Fourteenth Amendment.

The Presiding Judge says that "no state or federal equal protection questions are presented." Concurring Opinion, *ante* at 568. I cannot agree. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct.

3249, 3254, 87 L.Ed.2d 313 (1985). Section 19.08(a)(8) makes a classification within the ambit of the Clause because it creates a class of murderers (those who murder individuals under the age of six) and subjects them to different treatment.

When a statute is challenged as denying equal protection, the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. *Id.,* 473 U.S. at 440, 105 S.Ct. at 3254.

The appellant argues that the statute makes an irrational classification, which at one point she identifies as a distinction between children younger than six years of age and older children,[1] and at another point as a distinction between murders of children younger than six and murders of six-year-olds and older.[2] Her argument consists mostly of a critical, even sarcastic, evaluation of the legislative history of the statute which enacted the classification. While legislative history may have value in determining the meaning of a statute, it is irrelevant to deciding whether the statute has a rational relationship to a legitimate state interest.

> Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end. It is, of course, "constitutionally irrelevant whether this reasoning in fact underlay the legislative decision," *Flemming v. Nestor,* 363 U.S. [603], at 612, 80 S.Ct. [1367], at 1373 [4 L.Ed.2d 1435], because this Court has never insisted that a legislative body articulate its reasons for enacting a statute.

*United States Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461–462, 66 L.Ed.2d 368 (1980).

The classification "murderers of individuals under the age of six" is rationally related to the state's objective of protecting young children, for the reasons given in Judge Keller's opinion, *ante* at 562–563. This classification therefore survives the equal protection scrutiny. Since this analysis addresses and overrules the appellant's point of error, the feder-

---

1. Appellant's Brief at 120.

2. *Id.* at 128.

al equal protection inquiry should now be closed.

Judge Keller raises a question that the appellant does not:[3] whether the statute affects a fundamental right under the Equal Protection Clause of the Fourteenth Amendment. *Ante* at 560–561.

The general rule, that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest, gives way when state laws impinge on certain personal rights protected by the Constitution. Such laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. *City of Cleburne, Texas v. Cleburne Living Center, supra*, 473 U.S. at 440, 105 S.Ct. at 3254. The personal rights protected by the Constitution are called "fundamental rights" in federal equal protection jurisprudence. The fundamental rights are those in the first eight amendments to the Constitution that have been made applicable to the states, and an additional set of rights which are not specified in the Bill of Rights (rights to privacy in marriage, reproduction, contraception, and abortion; access to voting; and the right to interstate travel).

Judge Keller concludes that fundamental-right analysis must apply to capital punishment because it applied to the sterilization statute in *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), in which the Supreme Court held that procreation was a fundamental right. Judge Keller "would find it strange, indeed, to hold that the right to life is any less fundamental than the right to procreation." *Ante* at 561. She misidentifies the right in question and overlooks important differences in the sources of the constitutional protections.

The *Skinner* Court did say that marriage and procreation are fundamental, and that sterilization effected a permanent loss of the right. But this does not mean that the permanent loss of every constitutional right is subject to *Skinner* analysis. The right of procreation is one of the fundamental rights of privacy which are implied in the Constitution but not specifically identified in the first eight amendments of the Bill of Rights. Equal protection analysis is the first line of analysis in protecting those rights, because there is no substantive protection of them elsewhere in the Constitution. The right that the appellant claims is different.

While there are emerging issues of implied constitutional privacy rights to live and die,[4] a general right to life is not at issue in this case. The appellant's right is the Eighth Amendment right of a person convicted of crime not to suffer a punishment of death that is cruel and unusual.

The constitutional scrutiny of death penalty statutes under the Cruel and Unusual Punishments Clause of the Eighth Amendment has been extensive since *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). "The guiding principle that emerged from *Furman* was that States were required to channel the discretion of sentencing juries in order to avoid a system in which the death penalty would be imposed in a 'wanton' and 'freakish' manner. *Id.*, at 310, 92 S.Ct. at 2762–2763 (Stewart, J., concurring)." *Johnson v. Texas*, 509 U.S. 350, 359, 113 S.Ct. 2658, 2664, 125 L.Ed.2d 290 (1993) (brackets omitted). Another principle is that the death penalty must not be disproportionate to the crime. *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977).

The Texas statute in particular survived this scrutiny because it "limits the imposition

---

**3.** The appellant does not argue for strict scrutiny under the Fourteenth Amendment. In Point of Error Nine she argues for a strict scrutiny standard under the state constitution. As the Court holds, she fails to provide any reason why the state constitution requires such a standard when the federal constitution does not. *Ante* at 563 n. 17. Her argument is that strict scrutiny should be applied to the capital murder statute because it affects the appellant's Eighth Amendment

rights. As I explain below, the existence of Eighth Amendment scrutiny is the reason why strict scrutiny is unnecessary.

**4.** See, *e.g., Washington v. Glucksberg*, 521 U.S. ——, 117 S.Ct. 2302, 138 L.Ed.2d 772 (1997) (no due process right to commit suicide); Yale Kamisar, *When Is There a Constitutional "Right to Die"? When Is There No Constitutional "Right to Live"?*, 25 Ga. L.Rev. 1203 (1991).

of the death penalty to a narrowly defined group of the most brutal crimes and aims at limiting its imposition to similar offenses occurring under similar circumstances." *Jurek v. Texas*, 428 U.S. 262, 279, 96 S.Ct. 2950, 2960, 49 L.Ed.2d 929 (1976) (opinion of White, J.). Put another way, Texas' "action in narrowing the category of murders for which a death sentence may ever be imposed serves much the same purpose" as other states' statutory lists of aggravating circumstances. *Jurek v. Texas, supra*, at 270, 96 S.Ct. at 2955 (opinion of Stewart, J.).

The appellant's point of error has to do with the amendment of the capital murder statute to add the category of murders of individuals younger than six years. Penal Code § 19.03(a)(8). When the Texas statute is amended to add another category of murders, the amendment is scrutinized under the Eighth Amendment. See *Johnson v. State*, 853 S.W.2d 527, 533 (Tex.Cr.App.1992) (addition of murders of more than one individual), *cert. denied*, 510 U.S. 852, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993); *Narvaiz v. State*, 840 S.W.2d 415, 432 (Tex.Cr.App.1992) (same), *cert. denied*, 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993); *Vuong v. State*, 830 S.W.2d 929, 941 (Tex.Cr.App.) (same), *cert. denied*, 506 U.S. 997, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992). If the statute is made impermissibly broad by the addition of murders of individuals younger than six, the Eighth Amendment will have been violated.

While it is possible to make an equal protection issue of a violation of a fundamental right in the first eight amendments, it is not necessary.

In these instances the denial of the right to one class of persons is likely to be held a violation of the specific guarantee without any need to resort to equal protection analysis. Thus, if the state or federal government were to deny to a specific class of persons the right to bail upon certain criminal charges, the classification should be analyzed to determine the compatibility of the law with the substantive guarantees of the eighth amendment prohibition of excessive bail, although it could just as easily be analyzed as an equal protection issue.

R. Rotunda & J. Nowak, 3 *Treatise on Constitutional Law* § 18.39 (2d ed.1992). Just as a bail statute could be analyzed as an equal protection issue, but should be analyzed under the Excessive Bail Clause of the Eighth Amendment, so should a capital punishment statute be analyzed under the Cruel and Unusual Punishments Clause of the Eighth Amendment.

On the same day that *Jurek v. Texas* was decided, an opinion in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), indicated that fundamental-right analysis would be inappropriate in a capital-punishment case. The lead opinion by Justice Stewart said:

Therefore, in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we *presume its validity.* We may not require the legislature to select the least severe penalty possible so long as the penalty is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.

*Id.* at 175, 96 S.Ct. at 2926 (emphasis added). If capital punishment implicated a fundamental right to life, a capital-punishment statute could not be presumed valid, nor could the opinion have approved the statute because it was not "clearly wrong" (*id.*, 428 U.S. at 186, 96 S.Ct. at 2931). The deference that the Court showed to legislative decisions in *Gregg v. Georgia* demonstrates that fundamentalright analysis is not required. *Gray v. Lucas*, 677 F.2d 1086, 1104 (5th Cir.1982), *cert. denied*, 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983).

The appellant recognizes and relies on the Eighth Amendment standard, asking us to decide whether the statute, in the language of *Spaziano v. Florida*, 468 U.S. 447, 460, 104 S.Ct. 3154, 3162, 82 L.Ed.2d 340 (1984), "rationally distinguish[es] between those individuals for whom death is an appropriate sanction and those for whom it is not." Appellant's Brief at 120. Because the statute meets the Eighth Amendment standards, I join the Court's judgment on this point of error.

I join the Court's opinion on the other points of error.

MANSFIELD, J., joins this opinion.