NO. 07-02-0012-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

MARCH 10, 2003

_____

LARRY CRUZ,

Appellant

v.

THE STATE OF TEXAS,

Appellee

_____

FROM THE 359TH DISTRICT COURT OF MONTGOMERY COUNTY;

NO. 00-08-04685-CR; HON. JAMES H. KEESHAN, PRESIDING

_____

Before QUINN and REAVIS, JJ., and BOYD, S.J.[1]

In six issues, appellant Larry Cruz appeals his conviction for capital murder. Therein, he argues that the trial court erred in overruling his motions to suppress 1) the warrantless search of his motor vehicle, 2) the warrantless search of his residence, and 3) his videotaped and written statements given to police.[2] We affirm the judgment of the trial court.

---

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2003).

[2] Appellant contests the admission of this evidence in four separate issues.

## *Background*

On January 23, 2001, at approximately 9:45 p.m., Randall Ham arrived at a convenience store and parked in the parking lot. As he exited his vehicle, he noticed a person that he perceived to be a man come out of the store with a scared expression. He followed the person to his car and, as he saw the person get into the passenger side of the vehicle, he determined the person was carrying a gun. The vehicle then rapidly left the parking lot. Thereafter, Ham entered the store and saw two women, who had been shot, lying on the floor.[3] One of the women asked him to call 911, which he did. While speaking with the police, Ham described the vehicle as a small, white, and dirty car with an "apparatus" on the back and two, probably white, male occupants.

While on patrol, Corporal David Koth, with the Montgomery County Sheriff's Department, received a police dispatch about the robbery. Through it, he was told of the shooting and that the suspects were two males traveling in a small, white, and dirty two-door vehicle with an "apparatus" on the trunk.[4] Within six minutes of the broadcast, the officer observed a vehicle matching that description coming from the direction of the crime scene. He had not seen any other white vehicle since receiving the broadcast. As he passed the car with his emergency equipment activated, no one in the suspect vehicle looked at him. He found this to be an unusual reaction since, in his experience, most people will turn to look at a police vehicle when its emergency lights are on.

---

[3] Both women later died as a result of their gunshot wounds.

[4] Although the apparatus on the back of the car did not play a role in Corporal Koth's initial decision to stop the vehicle, he did notice the apparatus once the vehicle was stopped.

2

Koth then turned his vehicle around and followed the car until another police unit joined him. At that time, he stopped the car which he was following. The officers ordered both the driver (appellant) and his passenger to exit the vehicle. When they did, they were handcuffed, subjected to a pat-down search, and placed in police vehicles.

Having been told that the suspects were armed and having failed to discover a weapon on their persons, Koth proceeded to search the vehicle. While doing so, he observed a box of ammunition labeled "nine-millimeter Federal Hydra Shock." Information imparted to him by those at the scene of the crime indicated that the bullets used in the robbery were nine millimeter with a nickel shell. After hearing that, Koth opened the box to verify the type of ammunition it contained and discovered that the shells therein matched the description of those found at the crime scene. He also observed a pair of gloves on the ground beside the driver's door and money lying on the ground beside the gloves.

Although Ham was later brought to the site where the suspects had been detained, he was unable to positively identify either suspect. However, a videotape of the shooting provided a more detailed description of the shooter and that description matched the appearance of the passenger in the vehicle. That person was later determined to be a woman with a military-type haircut.

### Issue One - Search of the Vehicle

In his first issue, appellant argues that the trial court erred in denying his motion to suppress the evidence found as a result of the warrantless search of his vehicle in violation

of the United States and Texas Constitutions and article 38.23 of the Code of Criminal Procedure.[5]   We overrule the issue.

*Applicable Law*

In reviewing a trial court's refusal to suppress evidence, we must remember that it is the sole trier of fact.  *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).  Thus, it may believe or disbelieve all or any part of a witness' testimony, even if uncontroverted.  *Id.*  Additionally, when no findings of fact are executed (as here), we must view the evidence in a light most favorable to the ruling and assume that the court made implicit findings that support its ruling so long as those implicit findings themselves enjoy evidentiary support.  *Id.*  Finally, if the trial court's decision is correct under any theory of law, then the decision must be sustained.  *Id.*  With this in mind, we turn to the issue before us.

*Application of Law*

According to appellant, the search of the vehicle was unnecessary as a protective measure because he and his compatriot had already been handcuffed, placed in police vehicles, told that they were not free to leave and that their picture was going to be taken, and placed in custody.  In short, appellant argues that he had been arrested by the time Koth conducted the search.  *See Carey v. State*, 695 S.W.2d 306, 310 (Tex. App.–Amarillo 1985, no pet.) (holding that the detention was indistinguishable from an arrest when the officer Mirandized the suspect and placed him in the squad car without informing him that

---

[5] Appellant does not argue that the Texas Constitution affords him any greater protection than the Federal Constitution and he does not separately brief his claim that the search was in violation of article 38.23 of the Code of Criminal Procedure.  Therefore, we will not separately address those matters.  *See Garcia v. State*, 919 S.W.2d 370, 388-89 (Tex. Crim. App. 1996) (holding that when error is founded upon a violation of both the Texas and United States Constitutions, each claim must be separately briefed to avoid waiver).

4

he was free to leave). When an officer has made a lawful custodial arrest of an occupant of a car, he may search, incident to the arrest, the passenger compartment of the vehicle and examine the contents of any containers found therein. *California v. Acevedo*, 500 U.S. 565, 575-76, 111 S.Ct. 1982, 1989, 114 L.Ed.2d 619, 631 (1991), *quoting New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). So too may the officer search the automobile and containers found therein if he has probable cause to believe they hold contraband or evidence of a crime. *Id.* at 580, 111 S.Ct. at 1991, 114 L.Ed.2d at 634.

At bar, appellant does not substantively contend in his brief that the initial stop or his arrest at the scene was illegal.[6] Instead, he merely argues that the search which uncovered the ammunition and the officer's perusal into the box were improper. Yet, because the search was incident to what appellant alleges is an arrest, the officer was authorized to conduct it per *Acevedo*. And, because the wording on the box found pursuant to the search illustrated that it contained nine millimeter shells and Koth was told by other officers that such shells were found at the crime scene, he also had probable cause to believe that it contained evidence of the crime being investigated. Thus, opening it to verify the contents again was permissible under *Acevedo*.

---

[6]We say "substantively" because one could possibly read issue six as involving the legitimacy of the initial stop. Yet, aside from referring to the "initial stop" in general and asserting that the "illegal conduct of the law enforcement agents continued from the initial stop up to and through the obtaining of the statements," appellant makes no effort to explain why he believes it may have been improper. Nor does he cite any authority purporting to hold that it was improper. Given this dearth of briefing on the matter or compliance with Texas Rule of Appellate Procedure 38.1(h), we conclude that any complaint about the legitimacy of the initial stop was waived. *Billy v. State,* 77 S.W.3d 427, 429 (Tex. App.--Dallas 2002, pet. ref'd) (holding that the failure to properly brief an issue results in its waiver).

***Issues Two, Three, and Four – Validity of the Consent to Search His Home***

***and the Voluntariness of His Confessions***

Through the next three issues, appellant questions the validity of the consent he gave to search his home and the voluntariness of his confessions. Allegedly, his consent was invalid and confessions involuntary because of his age, his lack of education, his mental condition, and threats and promises made by his interrogators. We overrule the issues.

*Applicable Law*

We initially note that the validity of appellant's consent to search and his several written statements turn upon whether they evinced a knowing and voluntary act on his part. *Reasor v. State,* 12 S.W.3d 813, 818-19 (Tex. Crim. App. 2000) (involving the voluntariness of one's consent to search); *Darden v. State,* 629 S.W.2d 46, 51 (Tex. Crim. App. 1982) (involving the voluntariness of one's statement). And, whether they evince such an act depends upon the totality of the circumstances. *Reasor v. State,* 12 S.W.3d at 818 (involving the voluntariness of one's consent to search); *Creager v. State*, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997) (involving the voluntariness of one's statement).

*Application of Law*

There appears evidence of record that appellant had an IQ of 80, purportedly suffered a head injury when ten years old (he was 23 at the time of the offense), attended special education classes while in school, and experienced occasional losses in memory. Yet, whether the purported head injury, low IQ, and educational background prevented him from comprehending or understanding his surroundings, the circumstances before him, the

6

consequences of his actions, the words of others, or like matter were not directly addressed by either party. Nonetheless, the record does illustrate that he 1) was not retarded, 2) completed either the eighth or ninth grade, 3) obtained a G.E.D. (high school equivalency) certificate, and 4) could read and write, though his spelling may have been poor. Indeed, he wrote and signed the statements that he now attacks and wrote them in a comprehendible manner. These circumstances provide evidence from which a trial court could reasonably conclude that appellant had the mental acumen to converse with others, comprehend his surroundings and circumstances, and order his thoughts. That he could do so is also exemplified by the evidence illustrating that he twice asked to speak to an officer about his circumstances, conversed with the officer about the potential charges and punishment he faced, initially contrived a story exculpating him of guilt, and then later concluded that it would be to his benefit to cooperate with the officers. In short, appellant had the ability to think and plan. *See Gomes v. State*, 9 S.W.3d 373, 377 (Tex. App.–Houston [14th Dist.] 1999, pet. ref'd) (recognizing that while an appellant's limited intelligence is a factor to consider when determining if a statement was truly voluntary, his ability to reason or his possession of basic reasoning skills is also influential).

Next, pursuant to appellant's request, various officers did twice interview appellant after his arrest. Additionally, during their conversations the subjects of prosecution and punishment were discussed. In the first interview, appellant asked what he was "looking at." The officer responded that it depended on whether the store clerk died and that the State may seek a life sentence instead of the death penalty. Appellant then asked if he was given life imprisonment whether he could go ahead and ask for death to avoid the delay and anguish incident to serving a life term. The officer replied that he did not believe

7

appellant would have a choice. Yet, these circumstances are of no import for the discussion of the charges and punishment potentially facing an arrestee does not render an ensuing confession involuntary, especially when the conversation is initiated by the arrestee. *United States v. Davis*, 912 F. Supp. 245, 247-48 (S.D. Tex. 1995). Nor is a statement improperly tainted by discussion about potential punishment if the suspect decides to cooperate with the police. *Id.*

Yet, there is another representation uttered by an investigating officer about which appellant complains. During the second interview, the officer said the following:

> . . . You being a hundred percent truthful with us will help you avoid possibly getting the needle. I told you that last night. All right? Now it's up to you, son. It really is. We can play it just like you played it out last night, and I guarantee we'll get you convicted on two counts of capital murder, we will get you the death penalty. All right? Now, if you cooperate with us one hundred percent - - and I don't mean just a little bit, I mean one hundred percent - - we'll talk to the judge and we'll talk to the D.A.'s office and can almost - - but I'm not guaranteeing you anything, okay, because I can't guarantee anything - - but I can almost assure you if you cooperate a hundred percent the D.A.'s office will go along in asking for a life sentence without the needle. And with a life sentence, you always have the possibility of parole. Okay?

This purportedly constituted an impermissible promise sufficient to induce one in the position of appellant to fabricate testimony. We disagree given the several flaws in appellant's analysis. First, as to the mere discussion about a life sentence versus the death penalty, that does not constitute undue influence, as mentioned above. *See United States v. Davis, supra*.

Second, to render a confession inadmissible because it was induced through a promise or benefit, the promise must, among other things, be positive and unequivocal and spoken or approved by one in authority. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim.

8

App. 1993), *cert. denied,* 510 U.S. 837, 114 S.Ct. 116, 126 L.Ed.2d 82 (1993); *accord Henderson v. State,* 962 S.W.2d 544, 564 (Tex. Crim. App. 1997), *cert. denied,* 525 U.S. 978, 119 S.Ct. 437, 142 L.Ed.2d 356 (1998). Here, the officer told appellant that he "can't guarantee anything." In so conditioning his comments, he made his alleged promises less than the positive and unequivocal ones required by case law. So too does the condition implicitly illustrate that the officer lacked the authority to bind the State to any particular agreement; again, *he* could not guarantee anything.

Third, the promise must also induce the confession or statement. *Muniz v. State*, 851 S.W.2d at 254. Here, when initially queried about the affect the officer's utterance had on him, appellant did indicate that they influenced his decision to cooperate. Yet, later he contradicted that utterance. For instance, he told the trial court that his decision to cooperate, at least with regard to the search, was voluntary and free of influence from any threat or promise of benefit or reward. Thus, while appellant may have said that the comments influenced his decision to cooperate, he also said that they did not. Given these circumstances, the trial court was not obligated to suppress the statements as the products of an improper promise.

Nor did the officer's allusion to appellant being eligible for parole after 20 or 30 years (if he cooperated and was given a life sentence) render the confessions subject to suppression. It may well be that one convicted of a capital felony and assessed life instead of death may not be eligible for parole until he has served 40 years in prison. *See* TEX. GOV. CODE ANN. §508.145(b) (Vernon Supp. 2003). And, it may well be that the officer was wrong when he told appellant that the time period was only 20 or 30 years. Yet, deception

9

does not render a confession involuntary unless the deceit was calculated to produce a truthful confession or was of a nature offensive to due process. *Creager v. State*, 952 S.W.2d 856. And, we do not believe that the representation about parole was of that ilk. Again, it was correct in part; appellant could be eligible for parole after the passage of a certain period of time. And to the extent the officer was mistaken about the period of time that had to be served, the time period mentioned was not so short as to mislead the appellant into believing that he could escape punishment or be assessed only minimal punishment. To someone 23 years of age, 20 to 30 years of sitting in prison may still be viewed as a lifetime and little different than 40 years. The officer being mistaken by ten or 20 years is not enough for one to rationally infer that the deceit was calculated or of the ilk contrary to due process. Instead, the trial court could have interpreted the officer's comment as little more than an attempt to persuade appellant that some glimmer of freedom is better than the death penalty and, such a belief may well be true.

Also of import is the evidence that appellant was not only Mirandized when initially arrested but also before each interview. Morever, each of the three statements he signed also contained Miranda warnings and the representation that he was free to end the interviews whenever he chose. Accompanying these written warnings were written statements (which appellant also executed) illustrating that he waived the rights told him. Similarly, the consent form signed by appellant also contained a statement expressly illustrating that his decision to permit the search was knowing and voluntary.

In sum, the totality of the circumstances provided the trial court with basis upon which to clearly and convincingly hold that appellant's decision to grant the officers permission to search his house was knowing and voluntary. The same is true of

appellant's decision to execute three separate written statements inculpating himself. And, because they do, we cannot say that the trial court abused its discretion in refusing to grant appellant's motions to suppress.

### Issue Five - Admission of Videotaped Statements at Trial

In his fifth issue, appellant contends that his videotaped statements were subject to exclusion under article 38.22 of the Texas Code of Criminal Procedure. We overrule this issue because appellant failed to show us and we failed to find where in the record art. 38.22 was urged as a basis for excluding the tapes. In short, the complaint was not preserved. TEX. R. APP. P. 33.1(a)(1)(A); *Dooley v. State,* 999 S.W.2d 796, 797-98 (Tex. App.–Tyler 1998, pet. ref'd).

### Issue Six - Admission of the Oral and Written Statements as Illegal Fruits

In his final issue, appellant again argues that the trial court erred in overruling his objections to the admission of the oral and written statements because they were the fruits of the illegal search and seizure of his vehicle. That matter was addressed under issue one. And, having previously found that the search of the vehicle was proper, we need not again address the topic here. Thus, it is overruled.

Accordingly, the judgment of the trial court is affirmed.

Brian Quinn
Justice

Do not publish.