

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-76,925

### EX PARTE CATHY LYNN HENDERSON, Applicant

## ON APPLICATION FOR A WRIT OF HABEAS CORPUS FROM CAUSE NO. 94-2034 IN THE 229TH DISTRICT COURT FROM TRAVIS COUNTY

COCHRAN, J., filed a concurring opinion in which WOMACK, JOHNSON, and ALCALA, JJ., joined.

### CONCURRING OPINION

This case raises the same novel and difficult issue for the criminal-justice system that this Court faced, and, I maintain, fumbled in *Ex parte Robbins*:[1] Changing science has cast doubt on the accuracy of the original jury verdict.[2] Dr. Roberto Bayardo, who performed the autopsy of the victim in this case, testified unequivocally at trial that three-and-a-half-

---

[1] 360 S.W.3d 446 (Tex. Crim. App. 2011).

[2] For a thorough discussion of the jurisprudential issues raised by the problem of "shifting science" and the reliability of criminal verdicts over time, *see* Caitlin Plummer & Imran Syed, *"Shifted Science" and Post-Conviction Relief*, 8 STAN. J.C.R. & C.L. 259 (2012).

month-old Brandon Baugh "came to his death as a result of a severe closed head injury. . . characteristic of abuse, homicide." He concluded, without a scintilla of doubt, that the cause of Brandon's death was a severe closed-head injury and the manner of death was homicide. Dr. Bayardo was the State's star witness at trial on the cause and manner of Brandon's death. But, based on advances in the science of pediatric head trauma, he has since changed his mind: "Based on the physical evidence in the case, I cannot determine with a reasonable degree of medical certainty whether Brandon Baugh's injuries resulted from an intentional act or an accidental fall." This scientific uncertainty about Brandon's manner of death raises an extremely serious concern about the accuracy of the original jury verdict.[3] I write separately to provide some factual context for the habeas judge's recommendation to grant a new trial, the State's decision to agree with that recommendation, and this Court's adoption of the habeas judge's findings of fact and ultimate recommendation.

I.

On the morning of January 21, 1994, Eryn and Melissa Baugh left their infant son,

_____

[3] *See "Shifted Science, supra* note 2 at 263-64 (noting the problem of "what happens when scientific testimony that led to a conviction is later proved to have been completely invalid - a phenomenon we call 'shifted science.' Science - its very character defined as the search for what lies beyond the present horizon of human understanding - advances, changes, and evolves constantly. Unfortunately, courtroom procedures, practices, and the institutional knowledge of legal actors are just the opposite: the law takes pride in its consistency and glacial pace of adaptation. If science is a leading indicator of where society is headed, the law is a lagging indicator of truths society recognized years before, and may since have moved above and beyond. When the two come together in the case of scientific evidence being used in courtrooms, it should be no surprise that the results are often less than palatable.").

Brandon, with applicant, their regular babysitter.[4]  That day, both applicant and Brandon disappeared.  A kidnapping investigation began the next day.  On February 1, applicant was arrested by the FBI in Kansas City. At first, applicant denied any knowledge of Brandon's location or well-being. Later, she stated that Brandon's grandmother, driving a car with Oklahoma license plates, picked him up during the afternoon of January 21. Eventually, applicant admitted that Brandon was dead, but claimed that his death was an accident.  She also said that she had buried his body in a wooded area near Waco, that she had used a spade to dig the grave, and that she could take officers to his grave.

The single contested issue in the 1995 capital-murder trial was whether applicant intended to kill Brandon or whether she recklessly, negligently, or accidentally caused his death.  In her statement, applicant contended that Brandon's death was an accident–he accidentally fell from her arms onto a linoleum-covered concrete floor.[5]  The State's primary evidence to prove that applicant intended to kill Brandon consisted of the circumstantial evidence produced by the autopsy.[6]  At trial, Dr. Roberto Bayardo, the long-time and highly

---

[4] These background facts are taken, largely verbatim, from our opinion on direct appeal. *Henderson v. State*, 962 S.W.2d 544, 548-49 (Tex. Crim. App. 1997).

[5] Agent Napier testified that

[I]n telling the story, one time she would say that [Brandon] fell out of her arms, that he dropped out of her arms, and the final version is that while she's holding him with one hand . . . as she's trying to turn the recorder off with the other one so she can answer the phone, that he pushes his feet against the wall, and that motion then causes him to flip out of her hands and on to the floor.

[6] The trial judge noted in his factual findings that applicant's flight and conduct after Brandon's death was evidence of her guilty conscience that supported a finding of some culpable

experienced medical examiner for Travis County, testified that it was "impossible" for Brandon's extensive brain injuries to have occurred in the way that applicant stated.  He said that her story was false and "incredible."  In his opinion (and that of Dr. Sparks Veasey, the Deputy Chief Medical Examiner of Lubbock County), Brandon's injuries must have resulted from an intentional blow.[7]  He concluded, "I would say the baby was caught up with the hands by the arms along the body and then swung and slammed very hard against a surface."  In Dr. Bayardo's opinion, Brandon's death was the result of child abuse: "this is the worst case of head injury [at the hands of a person] I [have] ever seen."  The jury agreed and convicted applicant of capital murder in May 1995.

This Court affirmed applicant's conviction and death sentence on direct appeal[8] and denied relief on her initial writ application in 2002.[9]  The federal district judge denied her

---

mental state, but that "equivocal" evidence was not sufficient to establish, beyond a reasonable doubt, an intent to cause Brandon's death. *See* Finding of Fact Number 23, quoted on page 19.

[7] Dr. Veasey did not dispute Dr. Bayardo's opinion that "this was the result of single massive blow," but he had a "suspicion . . . that this may have been more than one impact causing these fractures[.]" The defense expert, Dr. Kris Sperry, testified that, although Brandon's death was not an accident, it could have been the result of an impulsive, reckless act rather than a volitional, intentional or knowing one.  The jury was charged on capital murder, intentional injury to a child, and reckless injury to a child.

[8] *Henderson v. State*, 962 S.W.2d 544 (Tex. Crim. App. 1997).

[9] *Ex parte Henderson*, No. WR-49,984-01 (Tex. Crim. App. March 6, 2002) (not designated for publication).

federal habeas petition in 2004,[10] and the Fifth Circuit affirmed that denial in 2006.[11]

The Honorable Jon Wisser presided over applicant's 1995 trial and is currently presiding over her subsequent writ application. Judge Wisser was sufficiently troubled by the preliminary scientific evidence initially presented to him that, on April 4, 2007, he recalled applicant's original death warrant and rescheduled her execution to give her sufficient time to gather additional material for this subsequent writ application.

On May 23, 2007, three weeks before her re-scheduled execution date of June 13, 2007, applicant filed this subsequent application for habeas relief based on recent scientific advances in the area of biomechanics and physics–advances that led Dr. Bayardo to recant his conclusive opinion that Brandon's head injuries could not have been caused by an accidental, short-distance fall. Dr. Bayardo's 2007 affidavit stated,

> Since 1995, when I testified at Cathy Henderson's trial, the medical profession has gained a greater understanding of pediatric head trauma and the extent of injuries that can occur in infants as a result of relatively short distance falls, based in part on the application of principles of physics and biomechanics. Specifically, and as shown in the reports that I have read, even a fall of a relatively short distance onto a hard surface can cause the degree of injury that Brandon Baugh experienced. If this new scientific information had been available to me in 1995, I would have taken it into account before attempting to formulate an opinion about the circumstances leading to the injury.

---

[10] *Henderson v. Dretke*, No. A–02–CA–758–SS, 2004 WL 5295477 (W.D. Tex. March 31, 2004) (not designated for publication).

[11] *Henderson v. Quarterman*, 460 F.3d 654 (5th Cir. 2006).

I have reviewed the affidavit of John Plunkett dated May 18, 2007,[12] and I agree with his opinion. Based on the physical evidence in the case, I cannot determine with a reasonable degree of medical certainty whether Brandon Baugh's injuries resulted from an intentional act or an accidental fall. In fact, had the new scientific information been available to me in 1995, I would not have been able to testify the way I did about the degree of force needed to cause Brandon Baugh's head injury.

Faced with this recantation, we held that applicant's first two claims–(1) she is innocent of capital murder, and (2) but for constitutional errors she would not have been found guilty of capital murder–satisfied the requirements of article 11.071, § 5(a). We then remanded her application to the trial court for consideration of the merits. Judge Wisser held hearings between November 17, 2008, and March 5, 2009, and listened to the testimony of twelve witnesses. Seven of these witnesses were medical doctors and four were scientists with Ph.Ds. The twelfth witness was Linda Icenhauer-Ramirez, one of applicant's trial attorneys.

At the habeas hearing, Dr. Bayardo testified that, because of recent scientific knowledge about how head injuries occur, he would no longer use words like "impossible" or "incredible" to describe applicant's version of the events. Also, he would no longer assert

---

[12] Dr. Plunkett's affidavit includes the following:

Neither I . . ., nor anyone else, can prove Brandon's injury and death was an accident. However, because of the new scientific information and analysis now available to scientifically evaluate Brandon's injury and death, neither may anyone prove that Ms. Henderson intentionally caused it. It is impossible for any qualified scientist or physician to conclude, whether to a reasonable degree of medical certainty, or beyond a reasonable doubt, that any intentional and deliberate act by Ms. Henderson caused Brandon Baugh's death, or that [his] injuries are such as to rule out an accidental cause.

that Brandon's injuries, if they were caused by an accidental fall, would have to be the result of a fall from a height of over two stories. He stood by the cause of death: a heavy blow to the head. But he would change the manner of death from "homicide" to "undetermined." He stood by his trial testimony that the comminuted depressed fracture of the back of the skull, which caused radiating fractures, was the result of a single blow. Dr. Bayardo said that, because Brandon sustained just one injury and that was to the back of his head, he doubted his prior finding of "homicide." In other child homicides, the infants had multiple injuries to the side or front, rather than the back, of the head.[13] Dr. Bayardo flatly contradicted his trial testimony when he concluded, "I don't believe it's a case of child abuse."

Applicant also called Dr. Monson, an assistant professor of biomechanics at the University of Utah, who studies traumatic brain injury in children; Dr. Plunkett, a forensic pathologist who studies pediatric head trauma; and Dr. Van Ee, who has a Ph.D. in biomedical engineering and studies impact and orthopedic biomechanics. They testified that the application of biomechanics to the study of pediatric head trauma and the medical community's recognition of the role of biomechanics in determining causes of injury are

---

[13] At trial Dr. Bayardo had said just the opposite.

Q.    Okay. Can you describe for the jury what is the significance of the location of the injury in this case?
A.    Yes. Also the location is quite characteristic of an abused child because most of the accidental injuries are going to occur on the sides of the head in the parietal bone. So whenever we see a fracture that includes the occipital bone, we immediately think of abuse.

recent and still developing. The medical community did not recognize a role for biomechanics in cases such as this one in 1998, when applicant filed her first habeas application.

These experts testified about "drop" experiments conducted with crash-test dummies and infant cadavers that measured the impact and injuries involved in short-distance falls, and how those experiments show the potential for head injury and death when babies fall short distances. Dr. Monson testified that he calculated the g-force involved in the fall (as described by applicant) to be 120 to 163g. Dr. Monson could not rule out the possibility that Brandon's death resulted from a short-distance fall: "So recognizing that the calculated values are well above when simple skull fracture may occur and also recognizing that there aren't data defining exactly when a fracture of this severity may occur, I have to conclude that you simply cannot rule out that possibility."

Dr. Plunkett testified about his playground-equipment study that included cases in which small children who fell short distances suffered complex skull fractures, brain injury, and death. He also could not rule out the possibility of an accident.

Q.    As a pathologist who has done intensive work in this area and now is an author and speaker and expert in the field, do you think it's scientifically plausible to offer an opinion on the cause of an infant's death in a case like this without any review or application of biomechanics?

A.    Not today, that's not acceptable.

Q.    Why not?

A.    Unless your experience is in the area of bioengineering, very few physicians have the

necessary knowledge to evaluate, to rigorously evaluate, Brandon's injury. It's got to go beyond medicine.

Q.     Based on your studies and your work, Dr. Van Ee's work, the CRABI[14] dummy tests that you've seen, all of your review of the medical reports, and a portion of Brandon Baugh's skull this morning, in your opinion, can any person conclude rationally and with certainty that the death of Brandon Baugh resulted from an intentional murderous act?

A.     No.

Q.     Could Brandon, in your opinion, have suffered a complex comminuted skull fracture from a drop of four feet–four and a half feet landing on the back of his head on a hard floor?

A.     Yes.

Dr. Van Ee performed an accident reconstruction using the CRABI-6 infant dummy. He testified that Brandon was probably traveling 11 miles per hour when he hit the concrete floor. "Severe injury is certainly a possibility and may even be likely for this type of impact." He testified that Brandon's skull fracture could have resulted from a fall of about four feet onto a carpeted or linoleum-covered concrete surface. He said there was now no "correct scientific support" for Dr. Bayardo's trial testimony.

Applicant's experts generally concluded that it was possible that a short-distance fall, like the one that applicant reported, could have caused Brandon's injuries. The State's experts then testified about the limitations and shortcomings of the studies and experiments described by applicant's experts and the rarity of head injuries with diffuse brain injury and complex skull fractures such as those Brandon suffered.

---

[14] CRABI stands for "Child Restraint Air Bag Interaction."

The State called Dr. Rangarajan, who has a Ph.D. in biomedical engineering and engineering mechanics. He designs crash-test dummies for government and industry use. Dr. Rangarajan designed a newborn-infant dummy for car-seat tests in Japan, and he testified about the limitations of using a dummy's response to predict injury. He noted that "dummies are calibrated to perform well in automotive seated posture." And, the dummies are only biofidelic (able to produce true human-like responses) within calibration limits. He said that there are not enough biomechanics data to assess the probability of injury, but he did not know whether the tests conducted by the defense experts were an accepted way of predicting severe head injury: "I don't know how to answer the question because I cannot say. I'm not like–I'm not the general secretary of the scientific community."

Dr. Case, a medical examiner, neuropathologist, and forensic pathologist who has published articles on short-distance falls and pediatric head injuries, also testified for the State. She has written on how to distinguish between accidental head injuries and inflicted or abusive head injuries. A marker, "the presence of the diffuse distribution of subdural blood over the cerebral convexities," signals brain injury produced by a blow to the head. Short falls, on the other hand, cause focal injuries, not diffuse ones.[15] Only "one to two to three percent of all short falls will result in a simple linear skull fracture." Brandon's injury, "a depressed comminuted skull fracture," signaled that he had suffered a blunt impact blow.

---

[15] Dr. Bayardo testified similarly at trial: "By just throwing the baby or just the baby falling from somebody's arms, the injury would have linear, a single short fracture on the side of the head or maybe in the front, but not on the back or the occipital bone."

"In my opinion, this is not going to result from a short fall [of] less than six feet. This fracture is not a fracture that I have ever seen in a short fall or that I have ever seen described in a short fall." Brandon had a "diffuse subdural hemorrhage," but Dr. Case could not tell whether it was the result of a single impact or multiple impacts.

Dr. Case disagreed with Dr. Bayardo about the significance of the fact that there were no other injuries on Brandon's body. In her experience, 25 to 50 percent of children who died from abusive head injury had no other marks on their body. Dr. Case specifically criticized Dr. Plunkett's work and testified that it was "on the fringe" and not widely accepted in the professional-medical community. Dr. Case thought the defense's focus on the fracture was misguided because "You have to focus on the entirety of the head injury."

Dr. Pustilnik, the Chief Medical Examiner for Galveston County and an assistant professor in pathology at UTMB, testified for the State and said that biomechanical engineering "looks at the body in what they call finite-point analysis. . . . In certain instances it falls apart when you have to look at differential . . . mechanisms when you have both rigid structures in the body interacting with liquid or gelatinous structures in the body." He said that there was "absolutely" a danger in taking readings from accelerometers in the crash-test dummies and making assumptions about how an infant of those dimensions would behave:

> [I]t's not any good to use the CRABI for head injury in these young infants because no one has studies on head injuries on infants the way they have studies on CRABI models. . . . They don't have–you know, three-month-olds don't have accelerometers behind their ears, so you can never know.

Dr. Pustilnik also criticized the cadaver studies because there were too many unknowns:

Were the children stored cold, room temperature, or frozen? Were they dried out? Were they dropped with the scalp intact? "You just don't know. It's not in the papers." It was Dr. Pustilnik's opinion that Brandon suffered "multiple impacts to the back and left or perhaps even right left-side back area" of his head.

Dr. Jenny, a professor of pediatrics and the director of the child protection program at a hospital in Providence, Rhode Island, has studied child abuse and car safety and has specialized in treating babies with head injuries. She also questioned the usefulness of the defense studies and testified that, based on the severity of Brandon's fractures, it was "highly likely" that he had been a victim of multiple impacts or crush injuries to his head. The fracture pattern was not consistent with a short fall from a care-giver's arms. Dr. Jenny characterized Dr. Plunkett's testimony about playground falls as disingenuous, and Dr. Van Ee's accident reconstruction "drop" tests with the CRABI-6 as lacking a proper protocol. She said it was "impossible" for Brandon to have suffered his injuries in a short fall. She disagreed with the other State's experts that such injuries were possible, though improbable, from a short fall. Those falls create "linear parietal" fractures, rather than complex fractures.

Dr. Gill-King, the director of the Laboratory of Forensic Anthropology and Human Identification, and a professor of forensic anthropology and pathology, who focuses on the material properties of bone, testified for the State. He likened the radiating fractures found on Brandon's skull to those created from shooting a BB-gun multiple times at a window: "A fracture stops another fracture." He disagreed with Dr. Bayardo that there was one blow to

Brandon's head because the injuries were distinct outside-to-inside injuries: "I concluded there were at least three separate applications of force. There may have been more, but there were at least three." He also stated that the CRABI-6 dummy's head does not in any way accurately portray the properties of a human infant head.

In rebuttal, applicant called Dr. Ophoven, a pediatric forensic pathologist and medical examiner, and Dr. Stephens, a forensic pathologist and former medical examiner.

Dr. Ophoven described the "pendulum swing" in the medical community with respect to pediatric injuries: before the 1980's, a doctor would generally accept a family member's report that a child's head injury occurred accidentally. In the late 1980's, doctors began to routinely disbelieve family members' reports of children's accidental head injuries and to assume abuse. Now, with studies applying biomechanics to the field of pediatric head injuries, doctors are more cautious about "ruling out" the possibility that a child's head injury occurred accidently. After reviewing the materials in this case, including the State's experts' testimony, Dr. Ophoven stated that short falls like that described here "rarely cause fatal injuries, but have the potential to kill." She stated that biomedical analysis is important in cases like this one, where there is no evidence of pre-existing or fresh abuse or assault and where the history comes in as a possible accidental fall. She said that Dr. Van Ee's and Dr. Monson's reports support their opinions that fatal injuries can occur from a fall of 46 inches onto the concrete surface described here. She also said that Brandon's injuries were consistent with a single blow; she did not see evidence of multiple impacts. She based this

on  "confluence bleeding from a single area of impact," and the "clear continuity between the fractures in the back with the fractures on the side[.]"  She said that she would not rely on a forensic anthropologist, like Dr. Gill-King, to help her with the cause of death or nature of injuries or number of impacts because "theirs is the area of bones and their training is not in making a determination and rendering it."

> Recent studies have clearly said, very clearly, you can not tell the difference between an accidental fracture and an inflicted fracture by how bad it is, how complicated it is, whether or not it crosses the suture line, whether or not it comes apart on the sides, that you cannot look at the fracture and say, I see abuse.

Dr. Ophoven summarized her testimony as follows:

> So this issue here is, is it my opinion that there is science to study the force that could be generated in a fall?  Yes.  Do we have reasonable expectations of what's the amount of force it takes for those falls to cause a fatal injury or death?  Yes.  Could those forces have been generated in this case?  Yes.  Do I have an opinion about what happened to Brandon?  I can't answer the question, but what I can say is he sure could have fallen and died.

The defense also called Dr. Stephens, who said that a medical examiner's change of the manner of death from "homicide" to "undetermined" represents a paradigm shift.  He did not regard Dr. Plunkett's work as marginal but instead opined that some professionals in the medical community would not let go of old beliefs when faced with studies that challenged them.  He personally had seen cases in which short-distance falls had killed children.  He did not agree with much of what Dr. Pustilnik had to say, and discounted the significance of fracture lines hitting one another.  He also agreed with Dr. Bayardo that the injuries Brandon sustained were the product of a single blow or impact.

Applicant also called her trial attorney to testify that she filed a pre-trial motion for funds to employ a biomechanical expert, but her motion was denied.

In sum, all but one of these ten medical and scientific experts agreed that Dr. Bayardo's trial testimony was now known to be scientifically inaccurate: Brandon's autopsy results did not establish that his death was the product of an intentional homicide. Indeed, all but one of these experts basically admitted that science cannot answer the question of whether Brandon's death was the result of an intentional homicide. It could have been an intentional homicide; it could have been an accident. Based upon the totality of the evidence, Judge Wisser recommended that this Court

> vacate the judgment of conviction in this cause, and . . . order that Applicant be returned forthwith from her present place of confinement to the custody of the Sheriff of Travis County Texas, where she may thereafter be held to answer any indictment or other charges made against her arising out of the death of Brandon Baugh.

## II.

Dr. Bayardo's change in opinion on the manner of death from "homicide" to "undetermined" does not mean applicant is actually innocent of homicide. Nor does it mean that his trial testimony was "false" at the time it was given, based upon the state of scientific knowledge that he relied upon at that time. Due process was not violated at the time of trial, but nevertheless, the scientific testimony that supported a finding of "homicide" in the original trial has been retracted. Dr. Bayardo's current scientific uncertainty, as well as the uncertainty of all but one of the experts at the habeas evidentiary hearing, casts a pall upon

the basis for the jury's verdict and upon its accuracy. At worst, the result of a change in the manner of Brandon's death to "undetermined" is only an admission that science cannot resolve the issue of whether Brandon's death was the result of a homicidal act.  The jurors would have to decide that crucial question based upon the rest of the evidence.

The problem is that we do not know whether the jury would have found that applicant intentionally (as opposed to recklessly, negligently, or accidentally) caused Brandon's death absent Dr. Bayardo's expert scientific opinion.[16]  I recognize that this case does not fit neatly into our habeas statute or our actual-innocence jurisprudence.[17] But until the Supreme Court

---

[16] I agree with Judge Price that

> while the applicant's flight undoubtedly evinces a guilty conscience, it provides little rational basis to conclude she felt guilty of an intentional or knowing murder, as opposed to a reckless or negligent homicide or even an excusable  accident.

*Ex parte Henderson*, 246 S.W.3d 690, 694-95 (Tex. Crim. App. 2007) (Price, J., concurring).

[17] As one law professor–addressing the tension between the governing framework for collateral relief and the issues presented by the "Shaken Baby Syndrome" cases–put it:

> Until scientific consensus has been achieved, the criminal justice system must find its own solutions to the problem of a diagnosis already morphed and still in transition.
> To date, our system has failed. In place of adaptation, we have seen massive institutional inertia. Once the SBS prosecution paradigm became entrenched, the crime became reified. Deferential review standards and a quest for finality perpetuated the system's course. How expeditiously, and how deliberately, this course is righted will inform the meaning of justice.
> Complicating the endeavor, SBS prosecutions raise discomfiting possibilities that diverge from those presented by the innocence archetype. Here, no other perpetrator can be held accountable; indeed, no crime at all may have occurred. The problem is not individual, but systemic, and its source is error, not corruption. Responsibility is diffuse: prosecutors and scientists may each legitimately point fingers. Most fundamentally, scientific developments have cast new doubt without yet creating certainty in its place. The story of SBS thus challenges current notions

(or this Court) holds that a conviction later found to be based upon unreliable scientific evidence violates the Due Process Clause,[18] I will stick by what I said in my *Robbins* dissent.

> Who should decide whether the newly discovered unreliability of the expert scientific testimony was so crucial to the original jury's verdict that the accuracy of that verdict can no longer be relied upon?

> I fall back upon the wisdom and experience of the habeas judge—the "Johnny–on–the–Spot" factfinder to whom we will defer whenever the record supports his essential factual findings.[19]

Judge Wisser held a series of live hearings so that he could hear, first-hand, from all the experts. And he has concluded that the accuracy of the verdict can no longer be relied upon.

The following findings–all supported by the record–are especially important to Judge Wisser's recommendation of a new trial:

7.     Dr. Roberto Bayardo served as the Chief Medical Examiner of Travis County for twenty-eight years, and personally conducted the autopsy of Brandon Baugh in

---

of wrongful convictions. Underlying conceptual frameworks must evolve accordingly.
    For now, we find ourselves situated in an extraordinary moment; one which tests our commitment to innocence that is not proven, but presumed.

Deborah Tuerkheimer, *The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts*, 87 WASH. U. L. REV. 1, 58 (2009).

[18] In *Han Tak Lee v. Glunt*, the Third Circuit intimated that advances in forensic science may support a due-process claim. In sending an arson case back to district court for an evidentiary hearing, the *Han Tak Lee* court stated, "If Lee's expert's independent analysis of the fire scene evidence—applying principles from new developments in fire science—shows that the fire expert testimony at Lee's trial was fundamentally unreliable, then Lee will be entitled to federal habeas relief on his due process claim." *Han Tak Lee v. Glunt*, 667 F.3d 397, 407-08 (3d Cir. 2012).

[19] *Ex parte Robbins*, 360 S.W.3d 446, 473-74 (Tex. Crim. App. 2011) (Cochran, J., dissenting).

February 1994.

8.    [Applicant] claims that the infant died when he accidently fell from her arms to the concrete floor of her home, a distance of approximately four-and-one-half feet. At the trial, however, Dr. Bayardo strenuously disagreed that the infant's death could have been accidental. Dr. Bayardo told the jury in no uncertain terms that "it would have been impossible" for an accidental fall to have produced the injuries sustained by the infant; that the claim of an accidental fall therefore was "incredible" and that to have sustained these injuries from a fall, the infant "would have to fall from the height higher than a two story building." For these reasons, Dr. Bayardo opined in his autopsy report that the manner of death was "homicide," meaning that the only way the infant could have sustained his fatal injuries was by means of a deliberate and murderous blow struck by Applicant.

9.    Dr. Sparks Veasey, then the Deputy Chief Medical Examiner of Lubbock County, also testified for the State at the trial. He reviewed Dr. Bayardo's autopsy report and photographs, and testified that the death resulted from blunt force trauma, probably resulting from "slamming into a wall or floor." As Dr. Plunkett has pointed out, however, Dr. Veasey's essentially repetitive testimony was uninformed by modern scientific learning and suffered the same vices as did the testimony of Dr. Bayardo. The State did not call Dr. Veasey as a witness at the evidentiary hearing. The Court does find that, if the jurors had heard Dr. Bayardo's re-evaluation, they would not have credited the then-conflicting testimony of Dr. Veasey.

10.    Based on the trial court record and the Court's personal recollection of the trial, the Court finds that the trial testimony of Dr. Bayardo was the critical evidence upon which the conviction of Applicant rested, and was the evidence upon which the essential element of culpable mental state hinged. The "impossible," "incredible," "two story building" and "slamming" testimony of the State's chief expert medical witness ruled out accidental cause. On that basis, the State persuaded the jurors that Applicant was guilty of murder beyond a reasonable doubt.
. . .

13.    Dr. Bayardo and Dr. Plunkett both testified at the evidentiary hearing. Based upon the content of their written submissions, the testimony of each witness during direct and cross-examination, and the demeanor of each witness, the Court finds the Affidavit and testimony of Dr. Bayardo, and the Affidavit, report and testimony of Dr. Plunkett, are true, and that each of these witnesses is credible.
. . .

17.    Dr. Bayardo testified at the evidentiary hearing that he continues to hold the opinions that he expressed in his Affidavit, and that [he] continues to share the views expressed by Dr. Plunkett in the latter's evaluation. Addressing the words he used in his testimony to the jury in 1995, Dr. Bayardo testified at the evidentiary hearing that he would not use "impossible" or "incredible" were he to testify to the jury today, "because of the new knowledge about how these types of injuries occur."

18.    Dr. Bayardo also explained that he used the "two-story fall" analogy in his 1995 testimony because "that's what I was taught during my residency and during my training that that's the way that these types of injuries happen," and "at that time, we didn't have any information about the biomechanical way of explaining these injuries." The two-story analogy "would have been my usual answer in cases like this" in 1995, but he would not say so today, because the new scientific developments in biomechanical investigations "put a doubt in my mind."

19.    In his 1995 Medical Examiner's Report Dr. Bayardo states that, in his professional opinion, the manner of the infant's death was "homicide." At the evidentiary hearing, however, Dr. Bayardo explained that he wrote "homicide" in 1994 because "at that time we didn't have any information about the biomechanical way of explaining these injuries[.]" He then testified that if he were preparing his report today, he would not have opined that the manner of death was homicide, but instead, "I would leave it undetermined," . . . .

20.    Applicant's witness, Dr. Peter J. [Stephens], is also a former Medical Examiner. He testified that this re-evaluation of the manner of death by Dr. Bayardo–from "homicide" to "undetermined"–was a significant "paradigm shift" representing a very fundamental re-evaluation.

21.    In addition, Dr. Bayardo explained that there were other circumstances that now cause him to doubt that Brandon Baugh's death was a homicide. He testified that

> All the previous cases I've seen that were the result of a
> homicide injury had the multiple, recent, and other injuries and
> also had multiple fractures of ribs and extremities, and they also
> had multiple bruises or scrapes of similar ages. And this baby
> did not have any of those injuries, and that the location [of the
> injury] was also different from the other cases I've seen . . . .

22.    Because Dr. Bayardo's testimony at trial was the critical evidence upon which the conviction of Applicant rested, and was the testimony upon which the essential

element of culpable mental state hinged, the Court finds that if Dr. Bayardo's re-evaluation had been presented to the jury in 1995, no rational juror could have or would have convicted Applicant of capital murder beyond a reasonable doubt in light of this new evidence.

In his Finding of Fact Number 23, Judge Wisser explicitly addressed the "guilty conscience"

evidence detailed by Judge Keasler:

23.    In making its Finding No. 22, the Court has not overlooked the State's evidence at trial concerning Applicant's flight after the death of the infant.  While flight might be some evidence of a guilty conscience, it is equivocal evidence at best, and on the basis of personal recollection, the Court finds that the evidence of flight did not have the capacity to prove the *mens rea* of capital murder beyond a reasonable doubt.

24.    In making its Findings, the Court has also considered the Applicant's evidence of the new scientific analysis, unavailable at the trial, upon which Dr. Bayardo based his re-evaluation.  The Court has done so in order to assure itself that Dr. Bayardo's re-evaluation is based upon a solid scientific foundation, and therefore supports the Court of Criminal Appeals' statement that the re-evaluation is a "material exculpatory fact."

25.    In this regard, the Court has read, heard, considered, and evaluated the reports and materials of Drs. Plunkett, Stephens, and Monson upon which Dr. Bayardo relied in his Affidavit, the trial testimony of these three experts, and the corroborating reports and evidentiary hearing testimony of Drs. Janice Ophoven and Chris Van Ee.

26.    The Court finds that Dr. Plunkett's Affidavit, his own report and materials, as well as the report of Dr. Peter Stephens, and the report of Dr. Kenneth Monson and the observed testimony of each of these witnesses at the evidentiary hearing, are truthful and credible.

27.    Dr. Plunkett's report in the present case, and those of the other experts, show that the 1995 testimony of the State's chief experts was, at bottom, scientifically flawed and grounded upon the belief that "short-distance falls" can never case fatal infant head trauma.  This belief no longer enjoys acceptance in today's scientific community.

28.    Dr. Monson made and explained a number of biomechanical calculations that he performed as an expert witness for Applicant, and concluded that the infant's assumed fall from Applicant's arms "had the potential to produce a serious injury," and that

"the possibility [of accidental death] cannot be ruled out given the current state of knowledge." The Court finds that Dr. Monson's Report and testimony are truthful and credible.

29.    Dr. Monson testified that, from an assumed fall height of 46 inches from Ms. Henderson's arms, the head of the infant would have been traveling at a speed of almost 11 miles an hour when it struck the floor, and that because the floor was a concrete, unyielding surface, the deceleration from 11 miles per hour to zero was virtually "instantaneous."

30.    Applicant's witness Dr. Kenneth Monson, and State's witness Dr. Nagaranjan Rangarajan, largely agree that scientific evidence available today cannot rule out the possibility of accidental death.

31.    At trial, Dr. Bayardo testified that the fatal trauma sustained by Brandon Baugh was the product of a single blow to the infant's head. This, of course, is consistent with the infant having fallen from Applicant's arms, and reaching a speed of eleven miles per hour when the back of his head struck the concrete floor, and thereby absorbed all the energy (G force) of the fall "virtually instantaneously." No evidence was introduced by the State that would have permitted the jury to find, much less beyond a reasonable doubt, that the infant sustained fatal trauma by reason of multiple blows to the head.

32.    At the evidentiary hearing, Dr. Bayardo provided a detailed explanation of his conclusion that the infant died as a result of a single blow to the head. He used his autopsy photos for this purpose, as well as explaining the "soft tissue" and other analyses that he observed or performed during the autopsy. Based both upon its assessment of Dr. Bayardo's testimony at the evidentiary hearing, and upon its personal recollection of Dr. Bayardo's testimony at the trial of this case in 1995, and at many other criminal trials at which this Court served as trial judge, this Court finds that Dr. Bayardo's "single blow" analysis is truthful and credible.

33.    Drs. John Plunkett, Janice Ophoven, and Peter Stephens each testified at the evidentiary hearing that they agreed with Dr. Bayardo's single blow analysis. The Court finds that all this testimony is truthful and credible.

34.    The reports of Drs. Plunkett, Stephens, Ophoven, and Monson, and these witnesses' corresponding testimony at the evidentiary hearing, support a finding that the biomechanical analysis that has been presented and used in this case was not available to Applicant in November 1998. Although biomechanical studies and analyses had

been used theretofore for accident prevention research and application–helmets, airbags, seatbelts, child restraint seats, etc.–it was not until the early 2000's that research began to focus for the first time on short distance falls and other traumatic events involving head injuries to infants and young children.

35.    The Court also heard the testimony of the State's experts, Drs. Mary Case, M.D., Carole Jenny, M.D., N. Rangarajan, Ph.D., Stephen Pustilnik, M.D., and Harrell Gill-King, Ph.D.  The Court finds that their testimony is truthful and credible.

36.    However, despite finding that both Applicant's and State's expert witnesses were truthful and credible, the Court finds that Dr. Bayardo's re-evaluation is based upon credible, new scientific evidence, and that the re-evaluation is, as the Court of Criminal Appeals stated, a "material exculpatory fact."

37.    Accordingly, the Court finds that Applicant has met her burden of proof under Sections, 5(a)(1) and 5(e) of Article 11.071, namely, that the factual basis of her claim was unavailable to her at the time she filed her prior application on November 17, 1998, and that the basis of her claim was not ascertainable through the exercise of reasonable diligence on or before that date.

Judge Wisser's single Conclusion of Law is: "Applicant Cathy Lynn Henderson has proved by clear and convincing evidence that no reasonable juror would have convicted her of the capital murder of Brandon Baugh in light of the new evidence presented in her Application." Judge Wisser signed his findings and conclusions on May 14, 2012.  On June 13, 2012, the State filed its response:

> The State has reviewed the habeas court's findings and conclusions on the first subsequent writ application.  Given that Dr. Roberto Bayardo, one of the State's major witnesses, has changed his opinion concerning the cause and manner of death of the infant Brandon Baugh, and in light of the court's findings that this new medical testimony would have impacted the jury's decision, the State does not oppose the habeas court's recommendation that the applicant's cause be remanded for a new trial.
>
> The State's position is not based on the belief that the applicant is not guilty.  Nor do we agree with the theory of biomechanics as presented by defense

experts and relied upon by Dr. Bayardo. But we do believe that the community must have confidence in a fair process and accurate outcome. To this end, we believe Dr. Bayardo's reevaluation and the habeas court's recommendation are important enough to merit a reconsideration of all the evidence, including the new scientific theories, by a jury.

Our decision not to file objections to the habeas court's findings, nor to oppose the court's recommendation for a new trial, is done so that this matter can be fully and fairly litigated.[20]

Under the standard for determining a bare claim of actual innocence announced in *Ex parte Elizondo,* an applicant must show "by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence."[21] This is what applicant claims; this is what the trial court concluded–that no reasonable juror would have found applicant guilty of the *capital murder* of Brandon Baugh–at least not to a level of confidence beyond a reasonable doubt.

Judge Wisser did not have to find that Brandon's death was an accident to conclude that applicant was entitled to a new trial based on Dr. Bayardo's changed testimony and the new expert testimony concerning scientific advances in biomechanics and forensic pathology. Judge Wisser's factual finding that "if Dr. Bayardo's re-evaluation had been presented to the jury in 1995, no rational juror could have or would have convicted Applicant of capital murder beyond a reasonable doubt in light of this new evidence" is entitled to

---

[20] The Travis County District Attorney's Office should be commended for its fidelity to the admonition that "[i]t shall be the primary duty of all prosecuting attorneys . . . not to convict, but to see that justice is done." TEX. CODE CRIM. PROC. art. 2.01.

[21] 947 S.W.2d 202, 209 (Tex. Crim. App. 1996).

deference because it is supported by the record.[22]    That does not mean that applicant is actually innocent of capital murder.  It simply means that the crucial evidence that had supported both the cause of Brandon's death and applicant's intent to cause his death has been retracted.  The present guilty verdict is based on scientifically unreliable evidence, but, after another capital murder trial, a guilty verdict could be based on scientifically reliable evidence or evidence that forthrightly admits that science cannot resolve the question of either causation or intent.

Given  Judge Wisser's profound concerns about the impact of Dr. Bayardo's expert testimony at trial on the critical, disputed issue of applicant's intent, I agree that applicant did not receive a fundamentally fair trial based upon reliable scientific evidence.[23]    Despite

---

[22] FF&CL 22.

[23] *See, e.g., State v. Edmunds*, 746 N.W.2d 590, 592 (Wis. Ct. App. 2008) (defendant, infant's babysitter, was originally convicted of first degree reckless homicide based on evidence of "shaken baby syndrome," but was entitled to new trial based upon her claim of newly discovered evidence in the form of advances in medical science that cast serious doubt upon the cause of infant's death).

In *Edmunds* the court noted that the State had, in the original trial of the case, called numerous expert witnesses who testified, to a reasonable degree of medical certainty, that the cause of the infant's death was violent shaking or violent shaking combined with an impact that caused a fatal head injury. *Id.*  The defense's own expert agreed with that cause of death, but suggested that the fatal injury could have occurred before the infant was brought to the defendant-babysitter's home. *Id.*  Ten years after the original trial, the defendant filed a subsequent motion for new trial alleging that there had been significant developments in the medical community concerning whether the infant's symptoms showed either "shaken baby syndrome" or shaking combined with head trauma. *Id.* at 593.  "The experts explained that there was not a significant debate about this issue in the mid-1990s and that the opinions offered in Edmunds's first postconviction motion would have been considered minority or fringe medical opinions." *Id.*  The State presented four experts who disagreed with the defense experts and maintained that the evidence at trial established that the infant had been violently injured while in the defendant's care. *Id.*  The trial judge agreed that the defense had presented newly discovered

evidence, but denied relief because he concluded that Edmunds had not established that there was a reasonable probability of a different result with the new expert evidence. *Id.* at 594. The court of appeals reversed and remanded the case for a new trial based upon the new scientific advances.

The court of appeals explained,

> The newly discovered evidence in this case shows that there has been a shift in mainstream medical opinion since the time of Edmunds's trial as to the causes of the type of trauma [the infant] exhibited. We recognize, as did the circuit court, that there are now competing medical opinions as to how [the infant's] injuries arose and that the new evidence does not completely dispel the old evidence. Indeed, the debate between the defense and State experts reveals a fierce disagreement between forensic pathologists, who now question whether the symptoms [the infant] displayed indicate intentional head trauma, and pediatricians, who largely adhere to the science as presented at Edmunds's trial. However, it is the emergence of a legitimate and significant dispute within the medical community as to the cause of those injuries that constitutes newly discovered evidence. . . . Now, a jury would be faced with competing credible medical opinions in determining whether there is a reasonable doubt as to Edmunds's guilt. Thus, we conclude that the record establishes that there is a reasonable probability that a jury, looking at both the new medical testimony and the old medical testimony, would have a reasonable doubt as to Edmunds's guilt.

*Id.* at 598-99. Thus, the court of appeals remanded the case for a new trial, not because the defendant had established that she was actually innocent of the offense, but because she had established a reasonable probability that a new jury, hearing both the new scientific evidence and the old medical testimony, would have a reasonable doubt as to her guilt. *Id.* at 599. This is the same standard as that for establishing prejudice in an ineffective assistance of counsel claim or materiality in a *Brady* claim. The defendant's position is not that he has proven actual innocence, but that he has raised sufficient doubts as to the accuracy and reliability of the original verdict, that he is entitled to a new trial. *See also Burr v. Branker*, No. 1:01CV393, 2009 WL 1298116, at *21 (M.D.N.C. May 6, 2009) (federal magistrate recommended granting habeas relief to state-court death-sentenced capital murder defendant for death of child based on counsel's failure to call biomechanical experts, including Dr. Plunkett, and specialized doctors who would have disputed cause of death as an intentionally inflicted blow to the head rather than an earlier short-distance fall; "This court concludes that there is a reasonable probability that the jury, or at least one juror, in Petitioner's case would have formed a reasonable doubt as to his guilt on the charge of first-degree murder had they heard the expert medical testimony that should have, and could have, been presented on Petitioner's behalf."), *report adopted*, 2012 WL 1950444 (M.D.N.C. May 30, 2012) (not designated for publication). *See generally "Shifted Science,"supra* note 2 at 267-71 (discussing *Edmunds*, "shaken baby syndrome," traumatic head injuries and the emergence of new scientific theories that undermine confidence in the original

every participant's honesty and good faith, this–as the District Attorney of Travis County forthrightly recognizes–is a case that should be retried to ensure the accuracy of our verdicts and the integrity of our system.  With these comments, I join the Court's order.

Filed: December 5, 2012
Publish

---

trial verdict).